UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

**FILED IN CLERK'S OFFICE**
U.S.D.C. Rome

OCT 1 8 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

Common Cause/Georgia,
League of Women Voters of
Georgia, Inc.,
The Central Presbyterian
Outreach and Advocacy Center,
Inc.,
Georgia Association of Black
Elected Officials, Inc.,
The National Association for the
Advancement of Colored People (NAACP),
Inc., through its Georgia State
Conference of Branches,
Georgia Legislative Black Caucus,
Concerned Black Clergy of Metropolitan
Atlanta, Inc., and the following
qualified and registered voters under
Georgia law:
Mrs. Clara Williams,

     Plaintiffs,

v.

                                        CIVIL ACTION FILE
                                        NO. 4:05-CV-0201-HLM

Ms. Evon Billups, Superintendent
of Elections for the Board of
Elections and Voter Registration
for Floyd County and the City
of Rome, Georgia,
Ms. Tracy Brown, Superintendent
of Elections of Bartow County,
Georgia,
Mr. Gary Petty, Ms. Michelle
Hudson, Ms. Amanda Spencer, Mr.
Ron McKelvey, and Ms. Nina
Crawford, members of the Board
of Elections and Registration of
Catoosa County, Georgia,
Judge John Payne, Superintendent
of Elections of Chattooga County,
Georgia,
Ms. Shea Hicks, Superintendent of
Elections for Gordon County,

1

Georgia,
Ms. Jennifer A. Johnson,
Superintendent of Elections for
Polk County, Georgia,
Mr. Sam Little, Superintendent of
Elections for Whitfield County,
Georgia, individually and in their
respective official capacities as
superintendents or members of the
elections boards in their individual
counties, and as class representatives
under Federal Rule of Civil Procedure
22(b)(1) and (b)(2) of a class
consisting of all superintendents and
members of city and county boards of
elections throughout the State of
Georgia, and
Honorable Cathy Cox, individually and
in her official capacities as
Secretary of State of Georgia and
Chair of the Georgia Elections Board,

   Defendants.

ORDER

This case is an action to have the photo identification ("Photo ID") requirement in the 2005 amendment to O.C.G.A. § 21-2-417 (Act No. 53), declared unconstitutional both on its face and as applied, and to enjoin its enforcement on the ground that it imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of article II, section 1, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty-Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. § 1971(a)(2)(A) and (a)(2)(B)), and Section 2 of the

Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)).  The case is before the Court on Plaintiffs' Motion for Preliminary Injunction [2] [23].

## I.    Background

### A.    The Parties

Plaintiff Common Cause/Georgia is a chapter of Common Cause, Inc.  (Compl. ¶ 1(a).)  Common Cause is a non-partisan citizen lobby organized as a not-for-profit corporation under the laws of the District of Columbia, and is devoted to causes such as electoral reform, ethics in government, and the protection and preservation of the rights of all citizens to vote in national, state, and local elections, including educating voters about voting rights and procedures.  (Id.)

Plaintiff League of Women Voters of Georgia is a non-partisan Georgia non-profit corporation that was founded in 1920.  (Compl. ¶ 1(b).)  Plaintiff League of Women Voters of Georgia's purpose is to encourage the informed and active participation by citizens in government at all levels, including the protection of the right of all citizens to vote and the education of voters about voting rights and procedures.  (Id.)

Plaintiff The Central Presbyterian Outreach and Advocacy Center, Inc. is a Georgia non-profit corporation that provides

3

support to people in poverty, including emergency services for basic human needs and assistance in achieving self-sufficiency, including assisting individuals in obtaining photo identification. (Compl. ¶ 1(c).)

Plaintiff Georgia Association of Black Elected Officials, Inc. is an unincorporated association of more than 700 elected officials throughout the State of Georgia who regularly conduct election campaigns and seek the votes of all registered, eligible voters. (Compl. ¶ 1(d).) It also promotes voter registration, education, and participation, preserves minority voting rights, and fights to ensure that no qualified voters are turned away on Election Day for failure to possess a Photo ID card in violation of their right to vote. (Id.)

Plaintiff the National Association for the Advancement of Colored People ("Plaintiff NAACP"), through its Georgia State Conference of Branches, is the nation's oldest civil rights organization. (Compl. ¶ 1(e).) Plaintiff NAACP was formed in 1909 by a multiracial group of activists, and has nationwide membership as well as members and offices in Georgia. (Id.) Plaintiff NAACP has advocated for the advancement and protection of voting rights for minorities, and, throughout its history, has fought for access to the ballot, for its members and for others. (Id.) It also has fought to ensure

4

that racial minorities, low income people, and economically disadvantaged people have access to the ballot box and an equal opportunity to participate in the political process. (Id.)

Plaintiff Georgia Legislative Black Caucus ("Plaintiff GLBC") was formed in 1966 and consists of elected African-American members of the House and Senate of the Georgia General Assembly. (Compl. ¶ 1(f).) Plaintiff GLBC's members, as elected representatives, engage in election campaigns, seek votes of registered, eligible voters, and also seek to make certain that the right to vote of all eligible citizens is protected and that no eligible voters are discouraged or prevented from voting on election day for failure to possess a Photo ID card in violation of their right to vote. (Id.)

Plaintiff Concerned Black Clergy of Metropolitan Atlanta, Inc. is a non-partisan, interfaith religious organization of mostly African-American members and laity whose mission is to provide leadership, advocacy, and service to the poor, the homeless, and the helpless in the metropolitan Atlanta area, including protecting their rights as citizens to full participation in the democratic process, including the right to register and vote without undue interference. (Compl. ¶ 1(g).)

Plaintiff Clara Williams is an African-American and duly

5

qualified and registered voter residing in the City of Atlanta and Fulton County, Georgia.  (Compl. ¶ 1(h)(ii).)  Plaintiff Williams does not possess a Georgia driver's license, passport, or other form of government-issued Photo ID, and cannot readily obtain a Photo ID card from the State Department of Driver Services.  (Id.)

Defendant Evon Billups is the Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County, Georgia, and is charged with the duty of conducting elections in Floyd County, Georgia, and the City of Rome, Georgia.  (Compl. ¶ 2(a)(i).)  Plaintiffs have sued Defendant Billups in her individual and official capacities.  (Id.)

Defendant Tracy Brown is the Superintendent of Elections for the Board of Elections and Voter Registration for Bartow County, Georgia, and is charged with the duty of conducting elections in Bartow County, Georgia.  (Compl. ¶ 2(a)(ii).) Plaintiffs have sued Defendant Brown in her official and individual capacities.  (Id.)

Defendants Gary Petty, Michelle Hudson, Amanda Spencer, Ron McKelvey, and Nina Crawford are members of the Board of Elections and Voter Registration for Catoosa County, Georgia, and are charged with the duty of conducting elections in Catoosa County, Georgia.  (Compl. ¶ 2(a)(iii).)  Plaintiffs have sued those Defendants in their official and individual

6

capacities. (Id.)

Defendant Judge John Payne is the Superintendent of Elections for the Board of Registrars for Chattooga County, Georgia, and is charged with the duty of conducting elections in Catoosa County, Georgia. (Compl. ¶ 2(a)(iv).) Plaintiffs have sued Defendant Payne in his official and individual capacities. (Id.)

Defendant Shea Hicks is the Superintendent of Elections for the Board of Elections and Registrations for Gordon County, Georgia, and is charged with the duty of conducting elections in Gordon County, Georgia. (Compl. ¶ 2(a)(v).) Plaintiffs have sued Defendant Hicks in her official and individual capacities. (Id.)

Defendant Jennifer A. Johnson is the Superintendent of Elections for the Board of Elections and Voter Registration for Polk County, Georgia, and is charged with the duty of conducting elections in Polk County, Georgia. (Compl. ¶ 2(a)(vi).) Plaintiffs have sued Defendant Johnson in her official and individual capacities. (Id.)

Defendant Sam Little is the Superintendent of Elections for the Board of Elections and Registration for Whitfield County, Georgia, and is charged with the duty of conducting elections in Whitfield County, Georgia. (Compl. ¶ 2(a)(vii).) Plaintiffs have sued Defendant Little in his official and

7

individual capacities.  (Id.)

Defendant Cathy Cox is the Secretary of State for the State of Georgia, and is Chair of the State Election Board. (Compl. ¶ 2(a)(viii).)  Defendant Cox has been designated as the Chief Election Official for purposes of the federal Help America Vote Act of 2002, and also is the Chief Election Official for purposes of the National Voter Registration Act of 1933.  (Id.)  Plaintiffs have sued Defendant Cox in her individual and official capacities.  (Id.)

Plaintiffs allege that the superintendents and board members of the city and county boards of elections named in paragraphs 2(a)(i) through 2(a)(vii) of the Complaint are members of a class that consists of superintendents and members of city and county boards of elections in each of the 159 counties in Georgia, who are so numerous as to make their joinder impracticable.  (Compl. ¶ 6.)  Plaintiffs seek certification of a defendant class of all superintendents and members of all city and county boards of election in Georgia under Federal Rule of Civil Procedure 23(b)(1) and (b)(2). (Id. ¶ 7.)

### B.   The Georgia Photo ID Requirement

Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present identification as a condition of voting.

8

(Compl. ¶ 8.)  In 1997, the Georgia General Assembly adopted
O.C.G.A. § 21-2-417, which required registered voters in
Georgia to identify themselves by presenting one of seventeen
forms of identification to election officials as a condition
of being admitted to the polls and of being allowed to vote.
(State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. Ex.
1.)   Prior to its amendment in 1997, O.C.G.A. § 21-2-417
permitted, but did not require, registered voters to present
a Georgia driver's license or other form of official
photographic identification as a method of identification as
a condition of voting.  (Compl. ¶ 10.)  Under the version of
O.C.G.A. § 21-2-417 as amended in 1997, voters remained free
to use any of eight other methods of identification for
voting, including a birth certificate, a social security card,
a copy of a current utility bill, a government check, a
payroll check, or a bank statement showing the voter's name
and address.   (State Defs.' Initial Br. Opp'n Pls.' Mot.
Prelim. Inj. Ex. 1.)  Additionally, voters who did not have,
or could not find, one of the seventeen forms of
identification specified in former O.C.G.A. § 21-2-417(a),
were entitled to be admitted to the polls, to be issued a
ballot, and to be allowed to vote simply by signing a
statement under oath swearing or affirming that he or she is
the person identified on the elector's certificate.  (Id.)

9

In 2005, the Georgia General Assembly adopted House Bill 244, or Act 53 ("HB 244"), which amended O.C.G.A. § 21-2-417 to require that all registered voters in Georgia who vote <u>in person</u> in all primary, special, or general elections for state, national, and local offices held on or after July 1, 2005, present a government-issued Photo ID to election officials as a condition of being admitted to the polls and before being issued a ballot and being allowed to vote. Plaintiffs have presented evidence indicating that the Georgia House of Representatives approved the Conference Committee Report on Act 53 by a vote of eighty-nine Republicans and two Democrats, while seventy-two Democrats and three Republicans voted against it. (Decl. of Ron D. Hockensmith ¶ 5 & Ex. 1.) The Senate adopted the Conference Committee Report on Act 53, with thirty-one Republicans and no Democrats voting in favor of the Act and eighteen Democrats and two Republicans voting against the Act. (<u>Id.</u>)

Plaintiffs have submitted the Declaration of Margaret S. Smothers, the former Executive Director of the League of Women Voters of Georgia. (Decl. of Margaret S. Smothers ¶ 2.) Ms. Smothers served as the League of Women Voters of Georgia's lobbyist during the 2005 session of the Georgia General Assembly, and worked on voting rights issues, including the proposals to require Photo ID. (<u>Id.</u> ¶¶ 2-3.) Ms. Smothers

10

observed:

4.

        One of the objections opponents had to the
photo id proposals was that the proposals included
no   funding   for   public   education   to   inform
registered voters of the new requirements that they
present a photo id card in order to have their vote
counted.    In contrast, when Georgia shifted to
electronic voting machines, the budget and staff of
the Secretary of State's office was temporarily
increased in order to engage in extensive public
education  efforts  to  prepare  voters  for  that
change.   At the March 21, 2005 hearing on HB 244
before the Senate Committee on State and Local
Governmental Operations (SLOGO), Randall Evans, who
sponsored the bill and who is currently a member of
the State Elections Board expressed the opinion
that the Secretary of State's office had funds
available from its current budget and that the
state could rely on the public education efforts of
such groups as the NAACP and AARP.    Similar
statements  about  the  advocacy  groups  being
sufficient to educate the public were made on the
Senate floor during the March 29, 2005 debate on
the photo id bill.

5.

        Advocacy groups opposed to the legislation
suggested the issue be studied prior to the next
legislative session to determine if there were in
fact  a  serious  number  of  incidents  of  voter
impersonation.   At the SLOGO hearing on March 21,
2005 referred to above, Senator John Wiles, chair
of the committee, asked if the groups would prefer
the legislation to be enacted in the 2005 session,
thus, in his view, providing a year for the groups
to conduct public education.   It was apparent from
this comment that the chair was either unaware or
was not concerned that municipal elections are
conducted in odd years.

(Id. ¶¶ 4-5.)

        Defendant  Cathy  Cox,  Georgia's  Secretary  of  State

11

("Secretary of State Cox"), wrote a memorandum to the members
of the Georgia State Senate, asking that the senators consider
the "staggering opportunities for voter fraud" that HB 244
would create. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. A at 1.)
Secretary of State Cox observed:

> By allowing any person, at any time within 45 days
> before an election, to vote an absentee ballot by
> mail – with no ID requirement and no requirement to
> state one of the current conditions for voting
> absentee (O.C.G.A. § 21-2-380) – such as being out
> of town on election day, having a disability, being
> over 75 years old, etc.), you would be opening a
> gaping opportunity for fraud. At virtually every
> meeting of the State Elections Board during the
> past 10 years, we have dealt with cases involving
> fraud or election law violations in handling or
> voting absentee ballots.    HB 244 removes all
> restrictions on voting by mail, and thus makes it
> quite simple for someone inclined to commit fraud
> to do so.
>
>      This completely contradicts the reasons stated
> for another measure contained in HB 244 – the Photo
> ID requirement.    If the authors are indeed
> concerned about voter fraud, they would not likely
> authorize the easiest – and most prevalent form –
> of election law violations: unregulated voting by
> mail.   In the past 9 years, neither my staff nor I
> can recall a single case or complaint of a voter
> impersonating another voter at the polls – the
> issue sought to be corrected by mandatory photo
> identification. And had this been occurring, some
> voter surely would have complained upon finding
> that someone else had voted under their name.   It
> hasn't happened.
>
>      I urge you to fully consider all the changes
> proposed by HB 244.   This bill started out as the
> "housekeeping" legislation proposed by my office,
> but other bills – HB 597 and SB 84 – have now been
> merged into it.   The bill attempts to solve a
> problem that does not exist while expanding the
> opportunity for fraud in the area that has long

12

been the most vulnerable to this type of abuse – the mailed absentee ballot.

(Id. at 1-2.)

On April 8, 2005, Secretary of State Cox wrote a letter to Governor Perdue expressing reservations about the Photo ID requirement contained in HB 244, and urging Governor Perdue to veto the bill.  In her April 8, 2005, letter, Secretary of State Cox observed:

> It is my strong belief that the picture identification requirement in House Bill 244 is (1) unnecessary, (2) creates a very significant obstacle to voting on the part of hundreds of thousands of Georgians, including the poor, the infirm and the elderly who do not have drivers licenses because they are either too poor to own a car, are unable to drive [a] car, or have no need to drive a car, (3) very unlikely to receive pre-clearance under the Voting Rights Act by the Department of Justice, (4) violates Art. II, section I paragraph I of the Georgia Constitution by adding a condition on the right to vote that is not contained in the constitution and (5) imposes an undue burden on a fundamental right of all citizens, the right to vote, in violation of both the state and federal constitutions."

(Id. at 1.)

Secretary of State Cox also expressed her belief that the Photo ID requirements of House Bill 244 are unnecessary:

> One of the primary justifications given by the Legislature for the passage of the photo identification provisions of House Bill 244 – the elimination of voter ID fraud at the polls – is an unfounded justification.  I cannot recall one documented case of voter fraud during my tenure as Secretary of State or Assistant Secretary of State that specifically related to the impersonation of a registered voter at voting polls.  Our state

13

currently has several practices and procedures in existence to ensure that such cases of voter fraud would have been detected if they in fact occurred, and at the very least, we would have complaints of voters who were unable to vote because someone had previously represented himself or herself as such person on that respective Election Day.   As a practical matter, there is no possibility that vote fraud of this type would have gone undetected if it had in fact occurred because there is a list of registered voters at each polling place that is checked off as each person votes.   If the impersonator voted first, and the legitimate voter came to the polling place later in the day and tried to vote, he or she would be told that they had already "voted" and would not be allowed to vote a second time in the same day.   It is reasonable to suspect that a voter who cared enough to show up at the polls to cast a ballot would almost certainly have complained – but there have been no such complaints.  If the opposite occurred, and the legitimate person came to the polls first and cast his ballot, the impersonator who showed up later would not be allowed to vote for the same reason and the attempted fraud would have been prevented.

In addition, this state has adopted severe criminal sanctions for the type of voter impersonation that is purportedly of concern and it is evident that such penalties have been a sufficient deterrent. In essence, there is no voter fraud problem currently in existence that House Bill 244 addresses. Additionally, the concern for this type of voter fraud has not prompted other states to approve legislation as restrictive as House Bill 244.   Forty-two of those states provide for other valid forms of identification besides photo identification. Of the other seven states, not one is as restrictive as the legislation recently enacted in our state.  If this type of voting fraud was a national trend, other states would likely be adopting legislation as restrictive as House Bill 244.

In contrast to the lack of voter fraud relating to impersonation of voters at polls during my tenure, the State Election Board has reviewed numerous

14

cases of voter fraud relating to the use of absentee ballots. However, the Legislature, in adopting House Bill 244 grossly expanded the opportunities for absentee voting by mail without any photographic identification requirement whatsoever, even though absentee ballots pose more of a threat of voting fraud than people voting in a polling location in their community. As a result, the type of voter fraud that *has* frequently occurred in our state is not addressed, and in fact is enhanced by the expansion of vote-by-mail opportunities. In sum, the justification for House Bill 244 is but a pretext.

(Pls.' Br. Supp. Mot. Prelim. Inj. Ex. B at 1-2.)  Secretary

of State Cox also observed that the Photo ID requirements

created substantial obstacles to many Georgia voters:

Requiring someone who is otherwise registered and fully qualified to vote to present a government issued picture identification at the polling place as a condition of voting places a very real burden on many people, and especially upon the poor and elderly who do not own or cannot drive a car and therefore do not have drivers' licenses. It is estimated by the League of Women Voters and the AARP that an estimated 152,664 individuals over the age of 60 who voted in the 2004 presidential election do not have a Georgia driver's license and are likely not to have other photo identification. For such voters to obtain identification is often an unnecessarily burdensome task, particularly if such voters are in retirement communities and assisted living facilities, or live in rural areas.

In addition, for many of the poorest residents of our state, photographic identification is not just a matter of unnecessary documentation that has no direct bearing on their day to day lives (they often have no need to drive or travel, or otherwise engage in activities that require a license), but is a burden of cost, economy and time. Although seemingly nominal, the $8.00 fee for an identification card may be a cost that many of our poor residents are unable to bear. Given the fact

15

that the United State[s] Supreme Court has held
that a $1.50 poll tax is an unconstitutional burden
on the ability [of] an individual to vote (*Harper
v. State Bd. of Elections*, 383 U.S. 663 (1966)), an
$8.00 fee for an identification card required by
the state would also seemingly be unconstitutional,
even if such fee may be waived by the state in the
event that a voter swears that he or she is
indigent.   In fact, to require that someone swear
and affirm they are indigent when they are above
the level of indigence but nonetheless too poor to
afford the cost of an identification card, is both
an affront to that person as well as an unlawful
requirement that he or she swear to something that
is not true.   In addition, there are other costs
related to obtaining an identification [card] which
the state does not have the ability to waive.   For
an individual working on an hourly wage, the time
it takes to travel to a DMVS (which may be an
unreasonable distance away from the resident[']s
home or office), wait in the lengthy lines that
result from only having 56 DMVS offices in the
state (according to the list of locations posted on
www.dmvs.ga.gov) and then the return commute,
results in actual lost wages.   For the state to
require this of our citizens, some of whom cannot
afford to take such time off, is an unnecessary
burden related to the exercise of that person's
right to vote.

The geography of state DMVS offices poses a
significant burden on many residents who would be
required to obtain identification in order to vote.
Given this state has only 56 DMVS offices, citizens
without cars who reside in 103 of the 159 counties
in Georgia must travel outside their home counties
to obtain a state-issue[d] picture ID in order to
vote.   Nor is there a single location to obtain
such an ID in the city of Atlanta.

(*Id.* at 2-3.)  Additionally, Secretary of State Cox expressed

her belief that HB 244 violated article II, section 1,

paragraph 2 of the Georgia Constitution because it imposed a

qualification on voters that was not listed in the Georgia

16

Constitution. (Id. at 4.) Finally, Secretary of State Cox expressed her belief that the Photo ID requirement imposed an undue burden on the fundamental right of citizens to vote:

> Our federal and state courts have consistently recognized the right to vote as one of the most fundamental rights of our citizens. *Wesberry v. Sanders*, 376 U[.]S[.] 1 (1964). The right to vote is "preservative" of other rights, and is one that bears the strictest of scrutiny and it is the fundamental nature of this right which cannot be burdened by state actions. *Harper v. State Bd. of Elections*, 383 U.S. 663 (1966), *Reynolds v. Sims*, 377 U[.]S[.] 533 (1964). The United States Supreme Court, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), recognized the close constitutional review required with respect to any restriction on the right to vote. In particular, the Supreme Court held in *Dunn* that "before the right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet strict constitutional scrutiny." In addition, our state Supreme Court has also held that "substantive due process requires that state infringement on a fundamental right be narrowly tailored to serve a compelling state interest." *State of Ga. v. Jackson*, 269 Ga. 308 (1998). Our Supreme Court has also held that "when it is established that the legislation 'manifestly infringes upon a constitutional provision or violates the rights of the people' that the statute should be declared unconstitutional." *Cobb County School District v. Barker*, 271 Ga. 35 (1995). The intersection of those two precedents presents two clear questions. First, acknowledging that the right to vote is a fundamental right, is House Bill 244 narrowly tailored to serve a compelling state interest? Second, is it established that the photo identification requirements of House Bill 244 do not manifestly infringe upon the rights of the people? Based on the foregoing facts referenced above, the answer to both of these questions is no.

(Id. at 5.)

On April 22, 2005, Governor Sonny Perdue signed HB 244,

17

and the Photo ID requirement of HB 244 became effective on July 1, 2005, subject to pre-clearance by the United States Department of Justice. (Compl. ¶ 15.) The Photo ID requirement of HB 244 is codified in O.C.G.A. § 21-2-417, which now provides:

> (a) Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:
>
> (1) A Georgia driver's license which was properly issued by the appropriate state agency;
> (2) A valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;
> (3) A valid United States passport;
> (4) A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;
> (5) A valid United States military identification card, provided that such identification card contains a photograph of the elector; or
> (6) A valid tribal identification card containing a photograph of the elector.
>
> (b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the

18

registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21-2-220, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

O.C.G.A. § 21-2-417.

On August 26, 2005, the Department of Justice granted pre-clearance to Georgia's Photo ID requirement. (State Defs.' Initial Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. 3.)

At the same time that the General Assembly voted to require the presentation of a Photo ID for voting, the General Assembly also voted to amend O.C.G.A. § 40-5-103(a) to double

19

the minimum fee for a Photo ID card from $10 to $20 for a five-year Photo ID, and to authorize a new ten-year Photo ID card for $35.    (Compl.  ¶  16.)    O.C.G.A.  §  40-5-103(a) presently provides:

> (a) Except as provided in subsections (b) and (c) of this Code section, the department shall collect a fee of $20.00 for a five-year card and a fee of $35.00 for a ten-year card, which fee shall be deposited in the state treasury in the same manner as other motor vehicle driver's license fees.
>
> (b) The department shall collect a fee of $5.00 for the identification card for all persons who are referred by a nonprofit organization which organization has entered into an agreement with the department whereby such organization verifies that the individual applying for such identification card is indigent. The department shall enter into such agreements and shall adopt rules and regulations to govern such agreements.
>
> (c) The department shall not be authorized to collect a fee for an identification card from those persons who are entitled to a free veterans' driver's license under the provisions of Code Section 40-5-36.
>
> (d) The department shall not be authorized to collect a fee for an identification card from any person:
>
>> (1) Who swears under oath that he or she is indigent and cannot pay the fee for an identification card, that he or she desires an identification card in order to vote in a primary or election in Georgia, and that he or she does not have any other form of identification that is acceptable under Code Section 21-2-417 for identification at the polls in order to vote; and
>> (2) Who produces evidence that he or she is registered to vote in Georgia.
>
> This subsection shall not apply to a person who has

20

been issued a driver's license in this state.

(d)   The   commissioner   may   by   rule   authorize
incentive discounts where identification cards are
renewed by Internet, telephone, or mail.

O.C.G.A. § 40-5-103.

The Communications Office of Georgia prepared a press release as to HB 244 stating that after the effective date of HB 244, only the following forms of Photo ID will be acceptable: (1) a Georgia Driver's license; (2) a State Identity Card; (3) a passport; (4) a Government Employee ID card; (5) a military ID card; and (6) a tribal ID card. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. F.) According to the same press release, the following forms of previously acceptable identification will no longer be accepted by election officials as valid forms of voter identification: (1) a birth certificate; (2) a Social Security Card; (3) a Certified Naturalization Document; (4) a current utility bill; (5) a bank statement; (6) a government check or paycheck; or (7) other government documents. (Id.) The information also includes a statement from Senator Cecil Stanton indicating that the Legislature wanted to "'protect the integrity of the [voting] process'" when it enacted the Photo ID law. (Id. at 2.)

The new Photo ID requirement applies only to registered voters who vote in person. (Oct. 12, 2005, Hr'g Tr.) The

21

General Assembly imposed no similar Photo ID requirement on absentee voters, except those voting absentee for the first time after registering by mail.  (Id.)

After adopting HB 244, Georgia became one of only two states that requires registered voters to present a Photo ID as an absolute condition of being admitted to the polls and being allowed to cast a ballot in federal, state, and local elections.  (Compl. ¶ 17.)  Thirty states do not require registered voters to present any form of identification as a condition of admission to the polls or to cast a ballot.  (Id.)  Twenty states require voters to present some form of identification of the polls.  (Id.)  Of those states requiring identification, only two states, Georgia and Indiana, require that voters present a Photo ID as the sole method of identification as a condition of voting.  (Id.; Oct. 12, 2005, Hr'g Tr.)

## C.    Obtaining a Photo ID Card

The State of Georgia issues photo identification cards ("Photo ID cards") at its Department of Driver Services ("DDS") offices.  (Decl. of Alan Watson ¶ 7 & Ex. C.)  As of October 1, 2005, the DDS had fifty-six full-time customer service centers and two part-time customer service centers in Georgia.  (Id.)  Georgia has 159 counties, and individuals who reside in some counties, particularly counties in south and

22

middle Georgia, may have lengthy drives to their nearest DDS service centers. (Id. Ex. C.)

No DDS service center is located within the Atlanta, Georgia, city limits or within the Rome, Georgia, city limits. (Watson Decl. Ex. C.) Fulton and DeKalb counties, however, have DDS customer service centers located at (1) 2801 Candler Road, Decatur, Georgia 30034; (2) 537 Shannon Mall, Union City, Georgia 30291; (3) 8610 Roswell Road, Suite 710, Sandy Springs, Georgia 30350; and (4) 8040 Rockbridge Road, Lithonia, Georgia. (Id. ¶ 8.) Floyd County, where Rome, Georgia, is located, has a full-time DDS customer service center located at 3386 Martha Berry Highway. (Id. ¶ 9.)

Individuals who wish to renew a valid Georgia driver's license or Photo ID card may do so via the Internet. (Watson Aff. ¶ 18.) The DDS makes accommodations for disabled applicants who appear at a DDS service center to obtain a driver's license or Photo ID card. (Id. ¶ 17.) DDS policy directs that those applicants be brought to the front of the line, given a "Q-Matic" ticket, and provided with a seat. (Id.) The DDS employees then serve the disabled applicants in the order in which their number is called. (Id.)

DDS also has a mobile issuance bus known as the Georgia Licensing on Wheels ("GLOW") Bus. (Watson Decl. ¶ 10.) During September 2005, the GLOW Bus visited twenty-five

23

locations.  (Id. ¶ 10 & Ex. D.)  During those visits, the DDS
issued a total of 122 free Photo ID cards for voting purposes,
ninety-one five-year Photo ID cards, thirteen ten-year Photo
ID cards, sixty-one five-year driver's licenses, nine ten-year
driver's licenses, and nine veteran's driver's licenses, and
also processed two address changes.  (Id.)  In addition to the
schedule for the GLOW bus established by the DDS, any group
may sponsor the GLOW bus for an appearance in a particular
location or community by making arrangements with the DDS.
(Id. ¶ 11.)

Plaintiffs have presented evidence indicating that DDS
employees gave inconsistent information in response to
inquiries concerning the locations and dates for an appearance
of the GLOW bus at Turner Field in Atlanta and for an
appearance of the GLOW bus in downtown Atlanta.  (Aff. of
Jennifer Owens ¶¶ 3-4.)  Plaintiffs also have presented
evidence indicating that the GLOW bus has steps for access and
is not accessible for purposes of the Americans with
Disabilities Act, and that individuals who are confined to
wheelchairs cannot enter the bus.  (Id. ¶ 6.)  The photography
and computer equipment on the GLOW bus is not mobile and
cannot be removed from the bus to service individuals who
cannot enter the bus.  (Id.)

Defendants have presented evidence indicating that all

24

individuals who wish to obtain a Photo ID card must complete an application and pay an applicable fee. (Decl. of Alan Watson ¶ 3.) If an applicant wishes to obtain a Photo ID card for voting purposes but cannot afford the card, a DDS employee will provide an affidavit to the applicant to complete. (Id.) The affidavit requires the applicant to swear or affirm that: (a) he or she is eligible to receive the Photo ID card free of charge because he or she is indigent and cannot pay the fee for the Photo ID card; (b) he or she desires a Photo ID card to vote in a primary or election in Georgia; and (c) he or she does not have any other form of identification that is acceptable under O.C.G.A. § 21-2-417 for voter identification purposes; (d) he or she is registered to vote in Georgia or is applying to register as part of his or her application for a Photo ID card; and (e) he or she does not have a valid driver's license issued by the State of Georgia. (Id. ¶ 4 & Ex. A.)

Defendants have presented evidence indicating that the DDS "considers the policy regarding the issuance of a free identification card for voting purposes to be completely nondiscretionary: if the applicant completes the Affidavit, the applicant is automatically eligible for a free photographic identification [card] for voting purposes." (Watson Aff. ¶ 5.) Defendants' evidence indicates that the

25

DDS "makes no effort to verify the provisions of these completed affidavits relating to the applicant's eligibility for a free identification card for voting purposes and does not question the applicant." (Id.) According to Defendants, "[i]n short, any applicant who completes such an affidavit will receive a free photographic identification card for voting." (Id.)

After HB 244 passed, the DDS trained its district managers concerning the above policy and the process for issuing free Photo ID cards for voting purposes. (Watson Decl. ¶ 6.) In turn, district managers trained their employees in the field offices. (Id.) Additionally, DDS sent a written notice concerning the policy and procedure for issuing free Photo ID cards for voting to all of its employees. (Id. & Ex. B.) Since the DDS began issuing the Photo ID cards for voting purposes, the DDS has received no complaints that individuals who wished to obtain the cards, whether free or paid, were denied the cards. (Id. ¶ 12.)

Defendants have presented evidence that as of July 30 or July 31, 2005, 5,674,479 Georgians possessed unexpired driver's licenses and 731,600 Georgians possessed unexpired Photo ID cards. (Watson Aff. ¶ 13.) When applying for licenses or Photo ID cards at the DDS service centers, applicants also may choose to register to vote under Georgia's

26

"Motor Voter" law.  (Id.)

In 2005, the fee for driver's licenses and Photo ID cards was $15.00 for four years.  (Watson Aff. ¶ 15.)  In 2005, the Georgia legislature changed the law to set a $20.00 fee for each driver's license and Photo ID card, and to provide that those driver's licenses and Photo ID cards would be valid for a term of five years.  (Id.)  The new law also provides that Georgians may purchase a ten-year driver's license or Photo ID card for $35.00.   (Id.)   Prior to 2005, the Georgia legislature had not increased the fees for driver's licenses or Photo ID cards in thirteen years.  (Id.)

Defendants have presented evidence indicating that the fee charged for driver's licenses and Photo ID cards is directly related to the costs of producing and issuing the driver's licenses and Photo ID cards.  (Watson Aff. ¶ 16.) For the fiscal year ending June 30, 2004, the DDS conducted a total of 3,344,823 transactions involving producing and issuing driver's licenses and Photo ID cards, obtaining a total revenue of $42,304,316.06 while spending $47,018,808.73 of its budget for the fiscal year.  (Id.)

The DDS's website explains how to apply for a Photo ID card.  (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. C.)  The website states that applicants for a Photo ID card must furnish proof that they reside in Georgia and provide a valid Georgia

27

residence address by presenting one of the following: (1) a utility bill with a valid Georgia residence address; (2) a bank statement with a valid Georgia residence address; (3) a rental contract or receipt with a valid Georgia residence address; (4) an employer verification; or (5) a Georgia license issued to the applicant's parent, guardian, or spouse. (Id.)  The website further states that first-time applicants for a Photo ID card must provide an acceptable form of personal identification that includes the applicant's full name and month, day, and year of birth.  (Id.)  Acceptable forms of personal identification include: (1) "[o]riginal birth certificate (State issued) State Vital Statistics (Hospital birth certificates are not acceptable)"; (2) "[c]ertified copy of birth certificate (issued from Vital Statistics with affixed seal)"; (3) "[c]ertificate of birth registration"; (4) certified naturalization records; (5) an immigration ID card from Immigration and Naturalization; or (6) a valid passport.  (Id.)

Plaintiffs also have submitted information from the Department of Vital Statistics' website concerning the process for obtaining a certified copy of a birth certificate. (Pls.' Br. Supp. Mot. Prelim. Inj. Ex. D.)  To obtain a certified copy of a birth certificate, an applicant must provide "a photocopy of your valid photo ID, such as: driver's license,

28

state issued ID card, or employer issued photo ID." (<u>Id.</u> at 1.)  An applicant must pay a $10 search fee.  (<u>Id.</u> at 2.)

The DDS and its predecessor, the Department of Motor Vehicles, only began collecting social security numbers three years ago, when they issued driver's licenses and Photo ID cards for four years. (Watson Aff. ¶ 19.)  Consequently, DDS has collected only three-quarters of the social security numbers for individuals holding driver's licenses and social security cards.  (<u>Id.</u>)  Consequently, matching a list of social security numbers for registered voters with the DDS's list of social security numbers to determine the identity of registered voters who hold a driver's license or a Photo ID card is not possible.

### D.  Declarations of Would-Be Voters

Plaintiffs have submitted a number of declarations or affidavits of voters.  The majority of the declarations state that the voters are not indigent, but do not have $20 to spend for a Photo ID card that they do not need except for purposes of voting.  (Decl. of Annie Johnson ¶ 6; Decl. of Betty Kooper ¶ 5; Decl. of Cheryl D. Simmons ¶ 5; Decl. of Clarence Harp ¶ 5; Decl. of Eva Jeffrey ¶ 4; Decl. of George Cliatt ¶ 6; Decl. of Katherine Jackson ¶ 5; Decl. of L. Dewberry ¶ 5; Decl. of Luanna S. Miller ¶ 5; Decl. of Mary Cliatt ¶ 6; Decl. of Norma Pechman ¶ 5; Decl. of Ronnie Gibson ¶ 5; Decl. of Rosa Brown

AO 72A
(Rev. 8/82)

¶ 8; Decl. of Ruth L. Butler ¶ 5; Decl. of Willie Boye ¶ 5.) A number of the voters do not drive or cannot afford a car. (A. Johnson Decl. ¶ 6; B. Kooper Decl. ¶ 5; C. Simmons Decl. ¶ 5; C. Harp Decl. ¶ 5; Decl. of Eleanor Whittenburg ¶ 2; E. Jeffrey Decl. ¶ 4; Decl. of Irene Laster ¶ 6; K. Jackson Decl. ¶ 5; L. Dewberry Decl. ¶ 5; Decl. of Lawrence Dorn ¶ 5; L. Miller Decl. ¶ 5; M. Cliatt Decl. ¶ 5; Decl. of Minnie Bridges ¶ 5; Decl. of Patricia Lane ¶ 4; Decl. of Pearl Kramer ¶ 5; R. Gibson Decl. ¶ 5; R. Brown Decl. ¶ 7; R. Butler Decl. ¶ 5; T. Jackson Decl. ¶ 5; W. Boye Decl. ¶ 5.)

Most of the voters do not have a driver's license, passport, tribal Photo ID, or other form of government-issued ID because they have no need for one. (A. Johnson Decl. ¶ 4; B. Kooper Decl. ¶ 4; C. Simmons Decl. ¶ 4; Decl. of Clara Williams ¶ 6; C. Harp Decl. ¶ 4; E. Whittenburg Decl. ¶ 4; E. Jeffrey Decl. ¶ 3; Decl. of Exie Brown ¶ 4; G. Cliatt Decl. ¶ 4; I. Laster Decl. ¶ 4; Decl. of Jason Benford ¶ 3; K. Jackson Decl. ¶ 4; L. Dewberry Decl. ¶ 4; L. Dorn Decl. ¶ 4; L. Miller Decl. ¶ 4; M. Cliatt Decl. ¶ 4; M. Bridges Decl. ¶ 4; N. Pechman Decl. ¶ 4; P. Lane Decl. ¶ 4; P. Kramer Decl. ¶ 4; R. Gibson Decl. ¶ 4; R. Brown Decl. ¶ 4; R. Butler Decl. ¶ 4; T. Jackson Decl. ¶ 5; W. Boye Decl. ¶ 4.) Quite a few of the voters are African-American. (A. Johnson Decl. ¶ 4; C. Williams Decl. ¶ 4; G. Cliatt Decl. ¶ 5; I. Laster Decl. ¶ 5;

AO 72A
(Rev. 8/82)