EXHIBIT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| COMMON CAUSE / GEORGIA; | ) | |
| LEAGUE OF WOMEN VOTERS | ) | |
| OF GEORGIA, INC.; THE | ) | |
| CENTRAL PRESBYTERIAN | ) | |
| OUTREACH AND ADVOCACY | ) | |
| CENTER, INC.; GEORGIA | ) | |
| ASSOCIATION OF BLACK ELECTED | ) | |
| OFFICIALS, INC.; THE NATIONAL | ) | |
| ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED | ) | |
| PEOPLE (NAACP), INC., through its | ) | |
| Georgia State Conference of Branches; | ) | |
| GEORGIA LEGISLATIVE BLACK | ) | |
| CAUCUS; CONCERNED BLACK | ) | |
| CLERGY OF METROPOLITAN | ) | |
| ATLANTA, INC.; NATIONAL | ) | |
| COUNCIL OF JEWISH WOMEN, INC., | ) | |
| the following qualified and registered | ) | |
| voter  under Georgia law: | ) | |
|     MRS. CLARA WILLIAMS, | ) | |
| | ) | |
|        Plaintiffs, | ) | |
| | ) | |
|     v. | ) | CIVIL ACTION |
| | ) | FILE NO. 4:05-CV-201-HLM |
| MS. EVON BILLUPS, Superintendent of | ) | |
| Elections for the Board of Elections and | ) | |
| Voter Registration for Floyd County and the | ) | |
| City of Rome, Georgia; MS. TRACY | ) | |
| BROWN, Superintendent of Elections of | ) | |
| Bartow County, Georgia; MR. GARY | ) | |
| PETTY, MS. MICHELLE HUDSON, | ) | |
| MS. AMANDA SPENCER, MR. RON | ) | |
| McKELVEY, AND MS. NINA | ) | |

132147

1

CRAWFORD, members of the Board of )
Elections and Registration of Catoosa )
County, Georgia; JUDGE JOHN PAYNE, )
Superintendent of Elections of Chattooga )
County, Georgia; MS. SHEA HICKS, )
Superintendent of Elections for Gordon )
County, Georgia; MS. JENNIFER A. )
JOHNSON, Superintendent of Elections )
for Polk County, Georgia; MR. SAM )
LITTLE, Superintendent of Elections for )
Whitfield County, Georgia; individually )
and in their respective official capacities as )
superintendents or members of the )
elections boards in their individual )
counties, and as CLASS )
REPRESENTATIVES under Fed.R.Civ.P. )
23(b)(1) and (b)(2) of a class consisting of )
all superintendents and members of city )
and county boards of elections )
throughout the State of Georgia; and )
)
CATHY COX, individually and in )
her official capacities as Secretary of State )
of Georgia and Chair of the Georgia )
Elections Board, )
)
          Defendants, )
)
      and )
)
STATE ELECTION BOARD, )
)
          Intervenor. )

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

This is an action to declare the invalidity, both on their face and as applied, and to enjoin the enforcement of both the 2005 amendment to O.C.G.A. § 21-2-417 (Ga. Laws 2005, p. 253) (hereafter referred to as "the 2005 Photo ID Act") and the 2006 amendment to O.C.G.A. § 21-2-417 (SB 84, as amended) (hereafter "the 2006 Photo ID Act")[1] that impose an unauthorized, unnecessary and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters in violation of Art. II, § I, ¶ II of the Georgia Constitution, the Fourteenth and Twenty-Fourth Amendments to the United States Constitution, the Civil Rights Act of 1964 (42 U.S.C. § 1971(a)(2)(A) and (a)(2)(B)), Section 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973(a)) and 42 U.S.C. §§ 1983 and 1988.

---

[1]     The 2006 Photo ID Act will not become law until pre-cleared by the Department of Justice.  In the event that the 2006 Photo ID Act is not pre-cleared, the 2005 Photo ID Act would remain in full force and effect subject to this Court's Order of October 18, 2005.  This Second Amended Complaint thus addresses constitutional and statutory challenges to both the 2005 Photo ID Act and the 2006 Photo ID Act so that the constitutional issues can be timely raised and resolved before Georgia's July primary elections, after the Department of Justice makes its determination on pre-clearance of the 2006 Photo ID Act.

132147                                    3

1.

**The Organizational Plaintiffs are:**

(a)    **Common Cause / Georgia** ("Common Cause"), a chapter of
Common Cause, Inc., a non-partisan citizen lobby organized as a not-
for-profit corporation under the laws of the District of Columbia, and
devoted to electoral reform, ethics in government and to the protection
and preservation of the rights of all citizens to vote in national, state
and local elections, including the education of voters about voting
rights and procedures;

(b)    the **League of Women Voters of Georgia, Inc.** ("the League"), a
non-partisan Georgia non-profit corporation founded in 1920 to
encourage the informed and active participation by citizens in
government at all levels, including the protection of the right of all
citizens to vote and the education of  voters about voting rights and
procedures;

(c)    **The Central Presbyterian Outreach and Advocacy Center, Inc.**, a
Georgia non-profit corporation that provides support to people in
poverty including emergency services for basic human needs and

assistance in achieving self-sufficiency, including assisting

individuals in obtaining photo identification;

(d)     **Georgia Association of Black Elected Officials, Inc.**, an

unincorporated association of more than 700 elected officials

throughout the State of Georgia, who regularly conduct election

campaigns and seek the votes of all registered, eligible voters.  The

Georgia Association of Black Elected Officials also promotes voter

registration, education and participation, that preserves minority

voting rights, and fights to ensure that no qualified voters are turned

away on election day for failure to possess a photo identity card (or

because of any other undue burden) in violation of their right to vote.

(e)     **The National Association for the Advancement of Colored People**

**(NAACP), Inc.**, through its Georgia State Conference of Branches,

the nation's oldest civil rights organization was formed in 1909 by a

multiracial group of activists.  The NAACP has nationwide

membership including members and offices in Georgia.  The NAACP

has advocated for the advancement and protection of voting rights for

minorities, and has, throughout its history, fought for access to the

ballot, for its members and others.  It has also fought to ensure that

132147                                                    5

racial minorities, low income and economically disadvantaged

persons have access to the ballot box and the equal opportunity to

participate in the political process.

(f)     **Georgia Legislative Black Caucus ("GLBC")** was formed in 1966

and consists of elected African-American members of the House and

Senate of the Georgia General Assembly.  As elected representatives,

members of GLBC engage in election campaigns, seek the votes of

registered, eligible voters and also seek to make certain that the right

to vote of all eligible citizens are protected and that no eligible voters

are discouraged or prevented from voting on election day by any

undue burden, including the failure to possess a photo identity card, in

violation of their right to vote.

(g)     **Concerned Black Clergy of Metropolitan Atlanta, Inc.**, a non-

partisan, interfaith religious organization of mostly African-American

members and laity whose mission is to provide leadership, advocacy

and service to the poor, the homeless, and the helpless in the

metropolitan Atlanta area, including ensuring that their rights as

citizens to full participation in the democratic process, including the

right to register and vote without undue interference.

(h)     the **National Council of Jewish Women, Inc. ("NCJW")** is a
volunteer organization, inspired by Jewish values, that works to
improve the quality of life for women, children, and families, and to
ensure individual and civil rights and freedoms for all through a
network of 90,000 members, supporters and volunteers nationwide.

(i)     Common Cause, the League, The Central Presbyterian and Advocacy
Center, Inc., Georgia Association of Black Elected Officials, Inc., The
National Association for the Advancement of Colored People
(NAACP), Inc., GLBC, the Concerned Black Clergy of Metropolitan
Atlanta, Inc., and the National Council of Jewish Women, Inc. (in the
aggregate, the "Non-Profit Plaintiffs"), are non-profit organizations
composed of members who would have standing to sue in their
individual right for the allegations set forth in the Complaint, the
interests which each of the Non-Profit Plaintiffs and their members
seek to protect in the Complaint are germane to the purpose of each of
the Non-Profit Plaintiffs, and neither the claim or the relief sought
requires participation by the individual members of the Non-Profit
Plaintiffs.

2.

The individual plaintiff is:

(a)     **Mrs. Clara Williams**, an African-American citizen and duly
        qualified and registered voter residing in the City of Atlanta and
        Fulton County, Georgia,

Mrs. Williams is a citizen of the State of Georgia and is legally

registered and duly qualified to vote in local, state and national

elections in Georgia, but does not possess a Georgia driver's license,

passport or other form of photographic identification specified in the

2005 Photo ID Act or the 2006 Photo ID Act.

3.

**The Defendants are:**

(a)     The following defendants are sued individually and in their official

        capacities as superintendents or members of their respective city or

        county boards of elections and also as Class Representatives of a class

        of city and county election superintendents or members of city or

        county election boards throughout the State of Georgia as provided by

        Fed.R.Civ.P. Rule 23(b)(1) & b(2):

        (i)     **Ms. Evon Billups**, who is sued individually and in her official

                capacity as the Superintendent of Elections for the Board of

Elections and Voter Registration for Floyd County, Georgia and

for the City of Rome, Georgia, in which capacity she is charged

by O.C.G.A. §§ 21-2-70 & 21-2-70.1 with the duty of

conducting elections in Floyd County, Georgia and in the City

of Rome, Georgia;

(ii)   **Ms. Tracy Brown**, who is sued individually and in her official

capacity as the Superintendent of Elections for the Board of

Elections and Voter Registration for Bartow County, Georgia,

in which capacity she is charged by O.C.G.A. § 21-2-70 with

the duty of conducting elections in Bartow County, Georgia;

(iii)   **Mr. Gary Petty, Ms. Michelle Hudson, Ms. Amanda**

**Spencer, Mr. Ron McKelvey, and Ms. Nina Crawford**, who

are sued individually and in their official capacities as members

of the Board of Elections and Voter Registration for Catoosa

County, Georgia, in which capacities they are charged by

O.C.G.A. § 21-2-70 with the duty of conducting elections in

Catoosa County, Georgia;

(iv)   **Judge John Payne**, who is sued individually and in his official

capacity as the Superintendent of Elections for the Board of

Registrars for Chattooga County, Georgia, in which capacity he is charged by O.C.G.A. § 21-2-70 with the duty of conducting elections in Chattooga County, Georgia;

(v) **Ms. Shea Hicks**, who is sued individually and in her official capacity as the Superintendent of Elections for the Board of Elections and Registrations for Gordon County, Georgia, in which capacity she is charged by O.C.G.A. § 21-2-70 with the duty of conducting elections in Gordon County, Georgia;

(vi) **Ms. Jennifer A. Johnson**, who is sued individually and in her official capacity as the Superintendent of Elections for the Board of Elections and Voter Registration for Polk County, Georgia, in which capacity she is charged by O.C.G.A. § 21-2-70 with the duty of conducting elections in Polk County, Georgia; and

(vii) **Mr. Sam Little**, who is sued individually and in his official capacity as the Superintendent of Elections for the Board of Elections and Registration for Whitfield County, Georgia, in which capacity he is charged by O.C.G.A. § 21-2-70 with the duty of conducting elections in Whitfield County, Georgia;

(viii)  **Cathy Cox**, who is sued individually and in her official

capacity as Secretary of State of the State of Georgia, in which

capacity she is the Chair of the State Election Board by

O.C.G.A. § 21-2-30(d), and has been designated as the Chief

Election Official for purposes of the federal Help America Vote

Act of 2002 by O.C.G.A. § 21-2-50.2, and also the Chief

Election Official for purposes of the National Voter

Registration Act of 1993 by O.C.G.A. § 21-2-210;

(ix)  **The State Election Board**, which was granted intervenor status

in an Order dated October 5, 2005.

## **Jurisdiction and Venue**

4.

This case arises under the Constitution and laws of the United States and of

Georgia.  This Court has subject matter jurisdiction of this action under 28 U.S.C.

§§ 1331, 1343(3) & (4) and 28 U.S.C. § 1367(a), and 42 U.S.C. §§ 1971(d),

1973j(f) and 1983.  This Court has jurisdiction to grant both declaratory and

injunctive relief under 28 U.S.C. §§ 2201 and 2102.

5.

Venue in this district and division is proper under 28 U.S.C. § 1391(b)
because all of the individual defendants identified by name in the complaint, other
than Secretary of State Cathy Cox, reside in this district and division.

### Class Allegations

6.

The superintendents and board members of the city and county boards of
elections named in paragraphs 2(a)(i) – (vii) above are members of a class that
consists of superintendents and members of city and county boards of elections in
each of the other 159 counties in the State of Georgia, who are so numerous as to
make their joinder impracticable and who can and will fairly and adequately
represent the interests of the members of the class because (a) there are questions
of law and fact that are common to the entire class of city and county election
officials, (b) the claims of the plaintiffs are the same as the claims of other
similarly situated qualified voters residing in the cities or counties, and (c) any
defenses that might be asserted by one local election official to those claims are the
same as the defenses that might be asserted by or on behalf of any other member of
the class to plaintiffs' claims.

7.

Certification of a defendant class of all superintendents and members of all city and county boards of election in Georgia under Fed.R.Civ.P. 23(b)(1) and (2) is appropriate because (a) the prosecution of separate actions in each of 159 counties would create a risk of inconsistent and varying adjudications, and (b) a final decision on the merits in one action may, as a practical matter, have an impact upon or be dispositive of the interests of other members of the defendant class.

## Pre-Existing Georgia Law

8.

Under the Georgia Constitution, both the **qualifications** of voters and the grounds on which an otherwise qualified voter may be disenfranchised and denied the right to vote are expressly set forth in Art. II, § I, ¶ II, and may not be modified by the legislature.  Art. II, § I, ¶ II provides:

> **Right to register and vote.**
>
> **Every person** who is a **citizen** of the United States and a resident of Georgia as defined by law, who is at least **18 years of age and not disenfranchised** by this article, and who meets **minimum residency** requirements as provided by law **shall be entitled to vote at any election by the people**.  The General Assembly shall provide by law for the registration of electors.

Georgia Const., Art. II, § I, ¶ II (emphasis added).

9.

Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present any form of identification as a condition of voting.

10.

As a result of the adoption by the General Assembly of O.C.G.A. § 21-2-417 in 1997, registered voters in Georgia were required for the first time to identify themselves by presenting one of seventeen forms of identification to election officials as a condition of being admitted to, and allowed to vote at the polls (former O.C.G.A. § 21-2-417), or by signing an Elector's Certificate under oath affirming the correctness of the voter's name and address.  O.C.G.A. § 21-2-417(b).

11.

Under O.C.G.A. § 21-2-417 as it existed prior to the 2005 Photo ID Act, registered voters were permitted, but were not required, to present a Georgia driver's license or other form of official photographic identification as a method of identification as a condition of voting.  Voters also had the right, however, to use any of eight other methods of identification, including such commonly available documents as a social security card, a copy of a current utility bill, a government

check, a payroll check, or a bank statement that showed the name and address of the voter.  Former O.C.G.A § 21-2-417(a)(10), (11), (14), (15), (16).

12.

The 1997 voter identification statute also had a "fail safe provision" that guaranteed the right to vote of any registered voter at the polls who did not have or was unable to find one of the seventeen forms of photographic or non-photographic identification specified in O.C.G.A. § 21-2-417(a) simply by allowing such a voter to vote by signing a statement under oath swearing or affirming that he or she is the person identified on the elector's certificate. O.C.G.A. § 21-2-417(b).

13.

This fail-safe provision was essential to ensure that no voter who possessed the qualifications specified in the Georgia Constitution and who had not been disenfranchised for one of the two reasons stated in the Constitution, would be allowed to vote, even if the voter did not have one of the 17 forms of approved identification specified in the statute, thereby avoiding a conflict between the constitutional right to vote and the 1997 voter identification statute.

14.

According to an August 25, 2005 "Section 5 Recommendation Memorandum" of the Voting Section of the Department of Justice career staff (Exhibit A), the 1997 Georgia voter identification statute was granted pre-clearance under Section 5 of the Voting Rights Act "based on two main factors: (1) the fail-safe procedure ensured that voters were not turned away for lack of authorized identification, and (2) minority contacts  [*i.e.* African-Americans in Georgia] did not urge an objection primarily because no voters would be turned away if they did not have proper identification."

## The 2005 Photo ID Act

15.

In 2005, the General Assembly of Georgia adopted the 2005 Photo ID Act, which amended O.C.G.A. § 21-2-417, to eliminate the fail-safe provision and require only those registered voters in Georgia who vote **in person** in primary, special or general elections for state, national and local offices held on or after July 1, 2005, to present a government-issued photographic identification card ("Photo ID") to election officials as an absolute condition of being admitted to the polls and before being issued a ballot and allowed to vote.

16.

The bill which became the 2005 Photo ID Act was sponsored by
Representative Sue Burmeister, a Republican member of the Georgia House of
Representatives, who told the Voting Section of the U.S. Department of Justice,
"that if there are fewer black voters because of this bill, it will only be because
there is less opportunity for fraud.  She said that when black voters in her black
precincts are not paid to vote, they do not go to the polls."  Exhibit A, p. 6; *see also*
Bob Kemper and Sonji Jacobs, "Voter ID Memo Stirs Tension: Sponsor of
Disputed Georgia Legislation Told Feds that Blacks in Her District Only Vote if
They are Paid to Do So," *Atlanta Journal Constitution* (Nov. 18, 2005)
(Exhibit B).

17.

The real purpose of the 2005 Photo ID Act was and is to perpetuate and
entrench control by the Republican Party over elections for state and federal
offices at all levels in Georgia by making it easier for white voters to cast absentee
ballots, and by making it more difficult, if not impossible, for voters who are poor,
elderly or infirm, to vote, and, most especially, to suppress the number of African-
American and other minority voters.

18.

The Secretary of State, as the Chief Election Officer in Georgia, informed the General Assembly, before the passage of the 2005 Photo ID Act, and the Governor before the 2005 Photo ID Act was signed into law, (Exhibits C and D) that the Act would open the door even wider to fraud in absentee balloting, while imposing a severe and unnecessary burden on the right to vote to hundreds of thousands of poor, elderly and minority voters, because there had been no documented cases of fraudulent voting involving in-person voting and the greatest concern about fraudulent voting concerned absentee voting.

19.

The 2005 Photo ID Act was approved in the House by an affirmative vote of 89 Republicans and 2 Democrats, while 72 Democrats and 3 Republicans voted in the negative.  The report of the Conference Committee on the bill was approved in the Senate by a vote of 31 Republicans, while 18 Democrats and only 2 Republican Senators voted against the report.

20.

All but one of the 44 African-American members in both houses of the General Assembly objected to and voted against the 2005 Photo ID Act.  The one exception was a Republican member of the Senate.

21.

The 2005 Photo ID Act was signed into law by Governor Sonny Perdue on April 22, 2005, and was scheduled to become effective on July 1, 2005, subject to pre-clearance by the United States Department of Justice under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

22.

On August 25, 2005, the career staff in the Voting Section recommended that the mandatory Photo ID requirement in the 2005 Photo ID Act be denied pre-clearance under the Voting Rights Act (Exhibit A), but their recommendation was overruled the next day by the Republican political appointees in the Department of Justice.  Dan Eggen, "Criticism of Voting Law Was Overruled – Justice Dept. Backed Georgia Measure Despite Fears of Discrimination," *Washington Post* (Nov. 17, 2005) (Exhibit E).

23.

At the same time that it voted to make the presentation of a Photo ID a mandatory condition of voting in person, the Republican Majority in both Houses of the 2005 General Assembly also voted (1) to amend O.C.G.A. § 40-5-103(a), **by doubling the minimum fee for a Photo ID** from $10 to $20 for a 5-year Photo ID, and authorizing a new 10-year Photo ID for a fee of $35, and (2) to amend

O.C.G.A. § 21-2-380(b) to make it easier for voters to obtain absentee ballots.  Ga. Laws 2005, p. 334 (Act No. 68) § 17-24(a).

24.

As a result of the adoption of the 2005 Photo ID Act, Georgia became the first of only two (2) states that requires registered voters to present a photo identification as an **absolute** condition of being admitted to the polls and allowed to cast a ballot in federal, state and local elections, and the Georgia statute is the most restrictive voter identification statute in the nation.  Voting Section Memorandum (Exhibit A, p. 42).  A majority of states (26) do not require registered voters to present any form of identification as a condition of admission to the polls or casting a ballot.  While a minority of states (24) requires voters to present some form of identification at the polls, Georgia is one of only two states that requires voters to present photo identification as a prerequisite for in-person voting with no fail-safe alternative.  *Id.*

**Enforcement of the 2005 Photo ID Act Was Enjoined**

25.

On October 18, 2005, the Court granted a preliminary injunction prohibiting the enforcement of the 2005 Photo ID statute on the ground that the "Plaintiffs have a substantial likelihood of success on the merits of their claim that the [2005]

Photo ID requirement unduly burdens the right to vote and a substantial likelihood

of success on the merits of their claim that the Photo ID requirement constitutes a

poll tax."  Order dated Oct. 18, 2005 ("October 18 Order"), p. 120.

26.

The decision of the Court to enjoin the enforcement of the 2005 Photo ID

Act as an undue burden on the right to vote was based on the factual finding that

"the State's interest in preventing voter fraud [did not] make[ ] it necessary to

burden the right to vote."  The Court found that the evidence showed:

> As discussed above, the Photo ID requirement is not narrowly tailored
> to the State's proffered interest of preventing voter fraud, and likely is
> not rationally based on that interest.  Secretary of State Cox testified
> that her office has not received even one complaint of in-person voter
> fraud over the past eight years and that the possibility of someone
> voting under the name of a deceased person has been addressed by her
> Office's monthly removal of recently deceased persons from the voter
> roles.  Further, the Photo ID requirement does absolutely nothing to
> preclude or reduce the possibility for the particular types of voting
> fraud that are indicated by the evidence:  voter fraud in absentee
> voting, and fraudulent voter registrations.  The State imposes no
> requirement for registering to vote, and has removed the conditions
> for obtaining an absentee ballot imposed by the previous law.  In
> short, HB 244 opened the door wide to fraudulent voting via absentee
> ballots.  Under those circumstances, the State Defendants' proffered
> interest simply does not justify the severe burden that the Photo ID
> requirement places on the right to vote.  For those reasons, the Court
> concludes that the Photo ID requirement fails even the <u>Burdick</u> test.

October 18 Order, pp. 95-96.

## The New 2006 Photo ID Act

27.

Although none of the facts identified by Judge Murphy in the excerpt from the Order quoted in paragraph 62 had changed at the time the General Assembly convened in January, 2006, the majority in both the House and Senate adopted the 2006 Photo ID Act, which repealed the 2005 Photo ID Amendment (O.C.G.A. § 21-2-417) and replaced it with identical Photo ID requirements for in-person voting and a new code section (O.C.G.A. § 21-2-417.1), requiring the board of elections in each county to issue a "Georgia voter identification card," containing a photograph of the voter, without charge to voters residing in the county, upon presentation of identifying documents that are only vaguely described.

28.

The 2006 Photo ID Act also amended O.C.G.A. § 40-5-103 by striking the previous subsection (d) in the 2005 Photo ID Act, which had required a voter to execute an affidavit of poverty to obtain a Photo ID without charge from the DDS and substituted in its place a requirement that the voter swear "that he or she desires an identification card in order to vote . . . and that he or she does not have any other form of identification that acceptable under Code § 21-2-417" and to "produce evidence that he or she is registered to vote in Georgia."

29.

On January 9, the first day of the 2006 legislative session, the House
Committee on Governmental Affairs of the Georgia House of Representatives
approved SB 84 by a straight party-line vote (7-3) and sent the bill to the floor of
the House.

30.

The effect of the 2006 Photo ID Act is to require every voter who does not
have a Georgia driver's license, passport or other form of Photo ID set forth in the
statute, to go back to the registrar or board of elections (or to go to a DDS office)
and essentially **re-register** to vote, and to provide, as a condition of such re-
registration and issuance of a Georgia voter identification card, **more**
documentation than is required by Georgia law either to register to vote in the first
instance, or to obtain an absentee ballot.

31.

The 2006 Photo ID Act, like the 2005 Photo ID Act that preceded it, applies
only to the hundreds of thousands of Georgia citizens who, by definition, do not
have a Georgia driver's license, a passport or other form of government-issued
Photo ID, and imposes a very severe burden on the right to vote of the poor,
elderly or infirm, who are the least mobile members of the electorate who will have

the greatest difficulty in complying with the requirements of the statute and do not

own, cannot drive or have access to a car.

32.

Before the full House considered SB 84, the *Atlanta Journal Constitution*

published a front-page article entitled, "REGISTRATION in GEORGIA: Bogus

Addresses Clutter Voter Registration Rolls," Alan Judd, *Atlanta Journal*

*Constitution* (Jan. 10, 2006).

33.

When SB 84 came up for a vote by the full House, the sponsor of the bill

still refused to address the known instances of fraud in voter registration and in

absentee voting, despite the findings of the district court and the numerous articles

that had appeared in the press reporting instances of fraud in both areas.

34.

The manner in which SB 84 was passed by the Georgia General Assembly

illustrates the purely partisan motivation behind the bill:

    (a)    the full House approved the Bill without amendment on January 12,

            2006 with complete Republican support, as not a single Republican

            voted against the bill and only 11 of the 81 Democrats supported it.

Of the 39 African-American members of the House, only 2, both Republicans, voted in favor of the Bill.

(b)     The Republican dominated Georgia Senate also passed the bill, voting almost entirely on partisan lines with 32 Republicans and no Democrats voting in support of the bill, and all 21 Democrats and one Republican voting against it.  Every African American in the Georgia Senate voted against the bill.

(c)     During the Senate's debate, the Republican Senate parliamentarian ruled "out-of-order" six proposed amendments that would have mitigated the effects of SB84, and that ruling, which prevented debate on the amendments, was sustained by a strict party-line vote of 33 Republicans to 21 Democrats.

(d)     The only two amendments that were allowed to come to a vote, each of which attempted to make the IDs accessible to handicapped and elderly voters, were defeated by the same partisan split as the bill itself with 32 Republicans voting down the amendments and all of the Democrats and a single Republican supporting them.

(e)     Because of an amendment in a Senate Committee, SB 84 returned to the House where it was again approved without a single Republican

dissenter, and with only 13 of the 81 Democrats in the House

supporting it.  Again, only two of the 39 African American

representatives, both Republicans, supported the bill.

35.

Racing through the legislative process, SB 84, which was passed by the

Senate on Tuesday, January 24, and the House on Wednesday, January 25, was

signed by Georgia's Republican Governor, Sonny Perdue, on Thursday, January

26.  A true and correct copy of the 2006 Photo ID Act "as passed" by the General

Assembly and signed by the Governor, is attached hereto as Exhibit F.

36.

Days after the 2006 Photo ID Act was signed by Governor Perdue, the

*Atlanta Journal Constitution* reported that "ABSENTEE VOTER FRAUD

UNTOUCHED BY ID LAW – Most Frequent Form of Cheating May be Eased by

Recent Rules," Alan Judd, *Atlanta Journal Constitution* (Jan. 29, 2006)

(Exhibit G).

37.

A voter is required by the new provision in the 2006 Photo ID Act to provide

county officials with more documentation to obtain a Georgia voter identification

card, than is required by Georgia law to register to vote or to obtain an absentee

ballot.  O.C.G.A. § 21-2-417.1(e):

> (e)    The board of registrars shall require presentation and verification of the following information before issuing a Georgia voter identification card to a person:
>
>> (1)    A photo identity document, except that a nonphoto identity document is acceptable if it includes both the person's full legal name and date of birth;
>>
>> (2)    Documentation showing the person's date of birth;
>>
>> (3)    Evidence that the person is registered to vote in this state; and
>>
>> (4)    Documentation showing the person's name and address of principal residence.

O.C.G.A. § 21-2-417.1(e).

38.

The wording of the provisions of O.C.G.A. § 21-2-417.1(e) is so vague and

general

> (a)    that it is impossible for a voter of average intelligence to know, without guessing, precisely what "documentation" or "evidence" is required to obtain a Georgia voter identification card from a county registrar or board of elections,
>
> (b)    that it is impossible for a county registrar or board of elections member to know, without guessing, precisely what "documentation" or "evidence" is required to obtain a Georgia voter identification card from a county registrar or board of elections, which means that the identification requirements are susceptible to inconsistent and

conflicting interpretations and applications from one of Georgia's 159 counties to another, and

(c)    it is also impossible to know whether a birth certificate, for which the State requires a $10.00 fee, is the only "nonphoto identity document . . . [that] includes the person's full legal name and date of birth" will, as a practical matter, be denied by one or more county election officials, or by the State Board of Elections to be "acceptable" under O.C.G.A. § 21-2-417.1(e)(1) or (e)(2), in which case the requirement will be an unlawful poll tax on the right to vote.

39.

The 2006 Photo ID Act, like the 2005 Photo ID Act, creates a conclusive presumption that any person who does not have a government-issued Photo ID of the type described in the 2006 version of O.C.G.A. § 21-2-417 is not registered and is not lawfully entitled to vote in person in Georgia, and that violates both Article II, § I, ¶ II of the Georgia Constitution and the Fourteenth Amendment to the United States Constitution.

40.

The General Assembly refused to delay the effective date of the 2006 Photo ID Act until after the 2006 primary and general elections, despite the fact that the number of citizens in Georgia who are over 18 and who would be precluded from voting in the 2006 primary and general elections for Governor, Lieutenant Governor, and other state-wide constitutional offices, for members of the Georgia House of Representatives and the Georgia Senate, and for Representatives in

Congress is in the **hundreds of thousands**, and is so large as to make compliance with either the 2005 Photo ID Act or the 2006 Photo ID Act prior to the 2006 primary and general election a physical impossibility for many of those voters, and for election officials.

### The 2005 and 2006 Photo ID Acts Apply Only To Voters Who Vote In Person and Do Not Apply to People Who Vote by Mail or to Voter Registration

41.

The 2005 Photo ID Act, as well as the 2006 Photo ID Act, apply solely to registered voters who vote **in person**.  In neither statute did the General Assembly impose a Photo ID requirement or any other identification requirement on (a) absentee voters, or (b) as a condition of registering to vote.

42.

Statistics from both the 2000 Census and from the 2004 general election in Georgia showed that white voters were twice as likely to use absentee ballots than voters who are African-American.

### The 2005 and 2006 Photo ID Acts Affect Hundreds of Thousands of Georgians of Voting Age

43.

According to Governor Perdue, an estimated 300,000 Georgians do not have a driver's license or other acceptable photo identification that could be used at the

polls.  *See* Jim Tharpe & Nancy Badertscher – "Voter ID Bill Likely To Be Law" (*Atlanta Journal Constitution*) (April 2, 2005) (Exhibit H).  Data from the U.S. Department of Transportation reflects that as of 2003, Georgia had 5,757,953 licensed drivers as compared to a driving-age population of 6,632,373 – a difference of 874,420 Georgia citizens of driving age without driver's licenses – or almost three times higher than Governor Perdue's estimate of the number of 300,000 citizens that would be impacted by the 2005 Photo ID Act.  According to the U.S. Census Bureau, a total of 390,414 Georgians of voting age and 242,929 Georgia households do not even have access to a car or truck.  The Census data from Georgia reflects that a median income of white households ($36,150) is almost twice that of black households, and 28% of blacks and 21% of Hispanics live in poverty, as compared to only 10% of whites.  The Census Bureau also reports that 140,000 African American households are without access to a car, as compared to 89,000 white households.  Finally, AARP and the League of Women Voters have estimated that over 152,000 Georgians who actually voted in the 2004 general election were over 60 and did not have a Georgia driver's license.

44.

The 2005 Photo ID Act and the 2006 Photo ID Act impose a severe, unnecessary and undue burden on the exercise of the fundamental right to vote of

hundreds of thousands of citizens of Georgia who, because of their poverty, age or physical infirmities, do not have a car, a Georgia driver's license or a passport, and are, therefore, the least mobile and most vulnerable members of society, and have the greatest difficulty in complying with the requirements of either Act.

45.

Compliance with the new Photo ID requirements in both the 2005 Photo ID Act and the 2006 Photo ID Act present an especially high obstacle for registered voters who are (a) poor and do not own a car or truck and do not have passports because they cannot afford to travel on a passport outside the United States; (b) elderly and no longer drive (nor have a passport which allows them to travel outside the United States); (c) visually impaired and are unable to drive (or travel on a passport outside the United States); (d) physically impaired and are unable to drive (or travel on a passport outside the United States); (e) residents of retirement or nursing homes who, by choice or necessity, do not have driver's licenses or passports; and (f) students without automobiles or passports who have Photo ID's issued by private colleges and universities (*e.g.*, Emory, Morehouse, Mercer), but who cannot vote in Georgia without first acquiring a Photo ID issued by the state or federal government.

46.

At the time the 2005 Photo ID Act became effective, the Department of Driver Services ("DDS") was the only state agency in Georgia from which a registered voter could obtain an official Photo ID.

47.

To obtain a Photo ID card from the DDS, as required by the 2005 Photo ID Act, a registered voter must (a) travel to a DDS office, (b) present an original or certified copy of a birth certificate or other "verifiable evidence" stating the applicant's name and birth date (O.C.G.A. § 40-5-102); and (c) pay a fee of $20 for a 5-year Photo ID or $35 for a 10-year Photo ID.  Payment of the fee to the DDS was eliminated a year later by the 2006 Photo ID Act, after this Court ruled on October 18, 2005, that the Plaintiffs were likely to succeed on the merits of their claim that the $20 fee was an "unconstitutional poll tax."

48.

At the time the 2005 Photo ID Act was adopted, there were only 56 DDS locations throughout the entire State of Georgia from which an official state Photo ID may be obtained (*see* Department of Driver Services website at www.dds.ga.gov).  These offices were only open from 9:00 a.m. to 5:00 p.m. Tuesday through Saturday, but are closed on Sundays and Mondays and evenings,

times when voters might be able to obtain a Photo ID without having to take time off from work.

49.

There was not then, nor is there now a single DDS office located within the City of Atlanta, Georgia's largest city, or in the City of Rome, which means that registered voters who are residents of those cities are required to travel outside the city limits to obtain the required Photo ID.

50.

Because there were only 56 DDS offices in the entire State of Georgia, tens of thousands of registered voters who lived in at least 103 of Georgia's 159 counties were required to travel outside their home counties to a DDS office located in another county to obtain a Photo ID from the DDS.

51.

To make matters worse, the DDS offices in urban areas typically have long lines and it is often necessary for a person to stand in line 3 or 4 hours to renew a Georgia driver's license or obtain a Photo ID.

52.

The time, inconvenience, and expense of traveling to a DDS office to obtain a Photo ID card is a significant hardship and burden on plaintiffs and the hundreds

of thousands of other registered voters who do not have driver's licenses,

passports, or employee Photo ID cards, and this burden does not exist for those

voters who have Georgia driver's licenses, passports, or state or federal employee

ID cards.  The burden is even heavier and a greater obstacle for citizens who are

paid on an hourly basis and may be forced to take time off from work to travel to a

DDS office because the DDS offices are not open evenings after 5:00 p.m. or on

Sundays.

## The $20 Fee For A Photo ID Under the 2005 Photo ID Act Is A Poll Tax On The Right To Vote

53.

The $20 fee for a 5-year Photo ID and the $35 fee for a 10-year Photo ID are

a poll tax on the right to vote because these fees are a financial condition for the

right to vote, and exceed the cost of the Photo ID to the State, and the revenue

collected by the DDS from the fees for a Photo ID card is deposited in the general

treasury of the State, where it is commingled with, and is indistinguishable from,

the revenue generated by other State taxes, including the State income or sales

taxes.  O.C.G.A. § 40-5-103(a).

54.

In addition to the $20 fee and other costs, the 2005 Photo ID Act also

imposed an additional undue burden on the right to vote of voters who did not have

a driver's license or a passport by requiring them to expend time and money to acquire the underlying documents required to obtain a Photo ID card and to travel to a state DDS office to obtain a Photo ID.

55.

The $20 (or $35) fees are also discriminatory because they are not required to be paid by all voters as a condition of continuing to vote.  Voters who have a Georgia driver's license, a passport, or a government-issued Photo ID are not required to pay a $20 (or $35) fee (or other costs) for a Photo ID in order to vote. Absentee voters who do not have driver's licenses, passports or other Photo ID are not required to present a Photo ID as a condition of receiving an absentee ballot, and, therefore, are not required to pay $20 (or $35) for the privilege of voting, while other similarly situated voters who vote in person and do not have driver's licenses or passports or other government-issued Photo ID's, are required to pay a $20 (or $35) fee for a Photo ID as a condition of being admitted to the polls.

56.

Moreover, payment of the $20 (or $35) fee is not a one-time expense (nor is the time, inconvenience and expense and lost wages involved to travel to a DDS office).  Unlike voter registration cards which are issued free of charge and never expire, a $20 Photo ID card is valid only for **five** years.  At the same time that the

General Assembly eliminated the previous requirement of Georgia law that a driver's license used for voter identification purposes must be "valid" (*i.e.*, unexpired), the 2005 Photo ID Act expressly requires that the non-driver's license Photo ID cards must be **"valid"** in order to vote, which means that voters who rely on non-driver's license Photo ID cards in order to vote, must pay $20 to obtain a *new* Photo ID card from a DDS office **every five years** (or $35 every 10 years) in order to continue voting.  This means that a 5-year Photo ID card is a $20 ticket that is good for admission to the polls for only one or at most two, gubernatorial elections and one (or at most two) presidential elections – but not two of each, before the Photo ID expires.  A voter whose Photo ID card has expired must acquire a new $20 (or $35) Photo ID card from the State in order to vote in the succeeding presidential, gubernatorial or local election.

<u>**The Waiver Of The Fee Is Ineffective**</u>

57.

The 2005 Photo ID Act also amended O.C.G.A. § 40-5-103 to allow the DDS to issue a Photo ID to a registered voter "who swears under oath that he or she is **indigent and cannot pay** the fee for the identification card, that he or she desires an identification card in order to vote in a primary or election in Georgia and that he or she does not have any other form of identification that is acceptable

at the polls under Code Section 21-2-417 for identification at the polls in order to vote."

58.

If the statute is read literally, even a registered voter who is "indigent" (a term that is undefined in the Act and vague in its general usage) cannot qualify for the waiver of the $20 fee under the first requirement of the statue if he or she has at least $20, because he or she cannot truthfully swear that he or she **"cannot pay the fee"** as required by the plain wording of the statute.

59.

A voter may not be able to qualify for a waiver under the second requirement of the statute because the term "indigent" in the 2005 amendment to O.C.G.A. § 40-5-103 is not defined and is so vague that a person of ordinary intelligence can only guess at the meaning of the term "indigent" in this context. Moreover, the Act leaves clerical personnel in each of the 56 DDS offices (and local district attorneys) free to apply their own subjective interpretations of the term "indigent" in determining whether a particular individual is eligible for a waiver of the $20 fee.  It is unclear, for example, whether a person who earns only $5.15 per hour minimum wage is "indigent" within the meaning of the statute and would qualify for a waiver of the $20 fee as a result.

60.

Even if the term "indigent" in O.C.G.A. § 40-5-103 were interpreted broadly under some unstated definition, the $20 fee would still constitute an unconstitutional poll tax on the right to vote of thousands of **other** registered voters who are not indigent, but who do not have driver's licenses, passports, or government issued Photo ID cards; moreover the $20 poll tax is also discriminatory because it does not have to be paid by absentee voters who have no identification, or voters allowed to vote in person because they have one of the permitted forms of photo identification.

61.

Finally, the waiver of the $20 fee for registered voters who are "indigent" and "cannot pay the fee," does not relieve a registered voter who does not have a valid Georgia driver's license, a passport, or other form of official Photo ID of the burden, inconvenience, and expense of having to spend the time and incur the cost of having to travel by bus or taxi to a DDS office that may be located in another city or county, miles from their homes or places of work to obtain a Photo ID in order to vote.  These costs constitute a far greater and more significant obstacle to voting than the $20 fee, and fall almost exclusively and most heavily on the poor, the infirm, and the elderly, who are least able to afford these additional costs, and

not on the more affluent voters who own cars, have driver's licenses and/or

passports.

### The 2005 Photo ID Act and the 2006 Photo ID Act
### Have a Disparate Impact On African-American Voters

62.

The new Photo ID requirement will also have a disparate impact on the right

to vote of registered voters who are African-Americans, as compared to voters who

are white, because, according to recent data published by the U.S. Census Bureau,

African-American voters in Georgia, as a group, (a) have only half the per capita

income of whites, (b) are almost three times as likely to live in poverty as whites,

(c) are three times less likely to own or have access to a motor vehicle than are

whites, and (d) are half as likely to vote absentee as white citizens of this Country.

Census Survey File 3 (SF3) HCT33B.

### It Is Impossible For Some Voters To Obtain A Photo ID from DDS

63.

The Georgia Department of Driver Services requires an applicant to present

an **"original or a certified copy"** of a birth certificate issued by an official state

agency as a condition of obtaining a Photo ID, and has also stated that "Hospital

birth certificates are not acceptable."  *See* Georgia Department of Driver Services

"Applying for a Georgia ID Card" (www.dds.ga.gov).

64.

A registered voter who was born in Georgia and does not have the original

or a certified copy of his or her original birth certificate, must apply to the Georgia

Division of Public Health and pay a fee of $10 for a certified copy of his or her

birth certificate.   *See* www.health.state.ga.us/programs/vitalrecords/birth.asp.

65.

The rules of the Georgia Department of Health make it impossible for a

registered voter who does not have a Photo ID to obtain a certified copy of his or

her birth certificate from the Georgia Division of Public Health because the

Georgia Division of Public Health demands the following:

### Required Information

**The person requesting a certified copy of a birth record
must provide** . . . a signed request form, and a **photocopy of your
valid photo ID, such as a driver's license, state-issued ID card, or
employer issued photo ID.**

www.health.state.ga.us/programs/vitalrecords/birth.asp.

66.

Moreover, it is also impossible for a registered voter who was born in

Georgia before 1919 to obtain a certified copy of their birth certificate because the

Georgia Division of Public Health does not maintain a record of births prior to

1919.  *Id.*

67.

Finally, many older and less affluent registered voters cannot obtain a Photo ID because they do not have birth certificates on file with the Department of Vital Statistics in Georgia or other states for a variety of reasons, including but not limited to:  (a) because they were born before such records were recorded and maintained, (b) because they were born at home and no official records of their births were filed, or (c) because they were informally adopted and have lived for years under the name of their adoptive parents, rather than the name under which they were born.

### The 2006 Act Does Not Eliminate the Illegal and Unconstitutional Aspects of the Photo ID Requirement

68.

While making cosmetic changes, the 2006 Photo ID Act does not alter the core features of the 2005 Act, which was enjoined by the Court on October 18, 2005.

69.

The 2006 Act continues to force only those voters who vote in-person to produce a Photo ID in order to vote, and the failure to possess such a Photo ID would continue to act as a conclusive presumption that an in-person voter is not who he or she claims to be.

70.

The 2006 Act continues to impose an improper and unnecessary burden only
on those Georgians least able to bear it by (1) continuing to force the hundreds of
thousands of Georgia voters without a government-issued Photo ID to spend both
time and money to re-register to vote by traveling to their county election office to
obtain an ID card; and (2) by continuing to burden these same voters with the
expense of locating, purchasing, etc., the documentation required to obtain a state
Photo ID.

71.

The mechanisms specified in the 2006 Act for County Election Boards to
provide Photo IDs are likely impossible to implement, because many boards of
election do not have permanent places of business where the IDs can be issued, and
the legislature has yet to provide any funding for the equipment and workers
necessary for county election boards to provide Photo IDs.

72.

Days after the 2006 Photo ID Act was signed by the Governor, the *Atlanta
Journal Constitution* carried an article entitled, "VOTER ID COSTS STILL
DEBATED – Counties say they're Already Burdened," Nancy Badertscher, Sonji
Jacobs, *Atlanta Journal Constitution* (Jan. 28, 2006) (Exhibit I).

73.

The 2006 Act, adopted after and in response to, the Court's October 18

Order strengthens the Court's conclusion that the Photo ID requirement "likely is

not rationally based on [the state's alleged] interest [in preventing voter fraud]"

because the 2006 Act did nothing to combat the fraud known to exist in absentee

balloting and voter registration, while addressing non-existent in-person voter

fraud at great expense to taxpayers.

### Evidence Showed that Fraud in In-Person Voting was Non-Existent and the Stated Purpose of the 2005 and 2006 Photo ID Acts (Fraud) is a Pretext

74.

According to a press release prepared by the Communications Office of the

Georgia House of Representatives, the purpose of Act 53 is:

> . . . to address the issue of voter fraud by placing tighter restrictions on
> voter identification procedures.  Those casting ballots will now be
> required to bring a photo ID with them before they will be allowed to
> vote.

75.

There was no evidence at the time of the adoption of the 2005 Photo ID Act

that the existing provisions of Georgia law have not been effective in deterring and

preventing imposters from fraudulently obtaining and casting ballots at the polls by

misrepresenting their true identities to election officials and passing themselves off as registered voters whose names appear on the official voter registration list.

76.

The Secretary of State, the chief election officer in Georgia and Chair of the State Election Board, informed both the Georgia Senate and the Governor prior to the passage of the 2005 Photo ID Act that there had not been a single documented case of fraud involving in-person voting reported to the office of the Secretary of State or the State Election Board in at least nine years.  *See* Exhibits C and D.

77.

At the hearing on the Plaintiffs' Motion for a Preliminary Injunction, the Secretary of State testified that there have been no cases of in-person voter fraud reported to the State Elections Board or to the office of the Secretary of State in the past 9 years.  October 18 Order, pp. 55, 95.  The district court found that the only evidence of fraud presented by the Defendants concerned "fraud in the area of voter registration, rather than in in-person voting."  October 18 Order, p. 83.

78.

The Secretary of State also testified that there have been no reports of ballots having been cast in the name of a voter who had died since Georgia law was

amended in 2001, to give the Secretary of State the power to remove the names of

deceased voters from the rolls.  October 18 Order, p. 58.

79.

Even the Vice Chairman for Public Affairs and Communication of the Hall

County GOP had admitted to the *Gainesville Times* that a Photo ID requirement is

unnecessary because there is no "fraud problem" involving in-person voting in

Georgia:

> I don't think we need it for voting, because I don't think
> there's a voter fraud problem.

"State's Voters Must Present Picture IDs," *Gainesville Times* (September 15,

2005) (www.gainesvilletimes.com).

80.

Despite these facts, the General Assembly fast-tracked the 2006 Photo ID

Act through the legislative process to attempt to cure some of the constitutional

infirmities in the 2005 Photo ID Act.  Like the 2005 Photo ID Act, however, the

2006 Photo ID Act deals only with in-person voters and not registration or

absentee voting.

81.

The assertion that the Photo ID requirement was necessary to prevent fraud

in in-person voting was and is a pretext that is intended to conceal the true purpose

of the 2005 Photo ID Act and the 2006 Photo ID Act, which was, and is, to give the Republican Party, which has an absolute majority in both Houses of the General Assembly and also controls the office of the Governor, an unfair advantage in future elections for Governor and other state-wide offices, members of the state legislature and members of the House of Representatives (1) by making it easier to cast absentee ballots where white voters (are twice as likely to vote by absentee ballots than black voters), despite the abundant evidence of fraud involving absentee ballots, and (2) by making it more difficult for the poor, the elderly and African-Americans to vote in the 2006 and future elections.

82.

That the imposition by the 2005 Photo ID Act and the 2006 Photo ID Act of a Photo ID requirement on voters who vote in person is unnecessary to prevent or deter fraud, and that the allegations of "fraud" are nothing more than a pretext for imposing a severe burden on the right to vote of poor, elderly, infirm and minority citizens, is shown by the following facts:

    (a)    Fraudulent voting was already prohibited as a crime by existing Georgia law under O.C.G.A. §§ 21-2-561, 21-2-562, 21-2-566, 21-2-571, 21-2-572 and 21-2-600, punishable by a fine of up to $10,000 or imprisonment for up to ten years, or both.

    (b)    Since 2001, it has been virtually impossible for dead people to vote in Georgia because voter registration records are updated periodically by the Secretary of State and local election officials to eliminate people

who have died, have moved, or are no longer eligible to vote in Georgia for some other reason.

(c)     Before being issued a ballot at the polls, every voter is required to sign an Elector's Certificate swearing under oath that he or she is the person whose name is printed on the Certificate and lives at the address stated therein.

(d)     Existing Georgia law also required election officials in each precinct to check the name and address of the voter in the Elector's Certificate against a current list of names and addresses of registered voters residing in that precinct, and to check off the names of each person from that official list before issuing a ballot (or a touch screen magnetic card) to the voter.

(e)     Registered voters were also required by existing Georgia law (O.C.G.A. § 21-2-417(a)) to present at least one of the seventeen forms of documentary identification (or to execute a sworn statement attesting to their identity and address (O.C.G.A. § 21-2-417(b)) to election officials who were required, before issuing the voter a ballot, to match the name and address shown on the document to the name and address on the official roll of registered voters residing in the particular precinct.  O.C.G.A. § 21-2-417.

(f)     There is no evidence that the existing Georgia laws and procedures have not been effective in deterring or preventing fraudulent in-person voting by impersonators – the only kind of fraudulent voting that might be prevented by the Photo ID requirement.  To the contrary, the Secretary of State, who, as the Superintendent of Elections, is the highest election official in Georgia, informed both the General Assembly (Exhibit C) and the Governor (Exhibit D) in writing that there had been no documented cases of fraudulent in person voting by imposters reported to her during her nine years in office.

(g)     If the true intention of the General Assembly had been to prevent fraudulent voting by imposters, the General Assembly would have imposed the same restrictions on the casting of absentee ballots – particularly after the Secretary of State had called to their attention the

fact that there had been many documented instances of fraudulent casting of absentee ballots reported to her office – and on voter registration, which currently require little, if any, identification.

(h)     Fraudulent in-person voting is an inherently, improbable and ineffective strategy for influencing an election, would have been easily detected if it had occurred in significant numbers, and would not be likely to have a substantial impact on the outcome of an election:

    (i)     People who vote in person must cast their ballots in the local precinct where they reside where a legitimate voter is very likely to be known to, and recognized by, neighbors or poll workers, and an imposter would be more likely to be detected.

    (ii)     An impersonation strategy is inherently improbable because it would require the participation of a large number of individuals of the correct age, race and sex to vote multiple times without voting a second time at the same polling place because of the great risk of being recognized.

    (iii)     An imposter would also be required to have in his or her possession one of the seventeen pieces of genuine identification belonging to each voter who he or she is attempting to impersonate, which would be virtually impossible to accomplish on a scale large enough to impact an election.

    (iv)     Impersonation would be easily detected because election officials are required, before issuing the ballot to the voter, to check off the name of either voter from an up-to-date list of the names and addresses of every registered voter residing in the precinct.  If an imposter arrived at a poll and was successful in fraudulently obtaining a ballot before the registered voter arrived at the poll, a registered voter, who having taken the time to go to the polls to vote, would undoubtedly complain to elections officials if he or she were refused a ballot and not allowed to vote because his or her name had already been checked off the list of registered voters as having voted.

Likewise, if an imposter arrived at the polls after the registered voter had voted and attempted to pass himself off as someone he was not, the election official would instantly know of the attempted fraud, would not issue the imposter a ballot or allow him to vote, and presumably would have the imposter arrested or at least investigate the attempted fraud and report the attempt to the Secretary of State as Superintendent of Elections.

## Both the 2005 Photo ID Act and the 2006 Photo ID Act are Overbroad and Neither Statute was Narrowly Tailored

83.

Even if the 2005 Photo ID Act or the 2006 Photo ID Act had been truly intended to prevent fraudulent in-person voting by imposters, both the 2005 Photo ID Act and the 2006 Photo ID Act are overbroad and neither Act was narrowly tailored:

(i)     Both statutes are overbroad because they apply to and burden the right to vote of the vast majority of innocent citizens who cast their ballots in person in order to prevent a hypothetical and miniscule number of people from attempting to vote by misrepresenting their identities to poll workers.

(ii)    Neither Act is narrowly tailored to prevent fraud in the two areas in which fraud is known to exist, namely (a) fraudulent voter registration, and (b) fraudulent voting of absentee ballots.

### There Were Many Less Restrictive Alternatives That Have Been More Effective to Prevent the Fraud that Does Exist

84.

If the motive of the Republican Majority in adopting the 2005 Photo ID Act or the 2006 Photo ID Act had been to prevent fraudulent voting, there were many more effective measures available that could have been adopted that would not have interfered with the right to vote of hundreds of thousands of poor, elderly and minority voters who are lawfully registered to vote.

### Count One

### (Violation of Art. II, § I, ¶ II of the Georgia Constitution)

85.

The allegations of paragraphs 1 through 84 above are hereby incorporated as allegations of paragraph 85 of Count One of the complaint.

86.

Art. II, § I, ¶ II of the Georgia Constitution sets forth the exclusive list of the qualifications to vote in Georgia and provides as follows:

**Right to register and vote.**

**Every person** who is a **citizen** of the United States and a resident of Georgia as defined by law, who is at least **18 years of age and not disenfranchised** by this article, and who meets **minimum residency** requirements as provided by law **shall be entitled to vote**

132147

50

**at any election by the people**.  The General Assembly shall provide by law for the registration of electors.

(Emphasis added).

87.

Each of the individual plaintiffs and every other citizen of Georgia has an absolute constitutional right to register and vote under Article II, § I, ¶ II of the Georgia Constitution, provided he or she meets the five qualifications set forth in the Georgia Constitution, which are exclusive:

(a)     is a citizen in the United States;

(b)     is at least 18 years of age;

(c)     meets the minimum residency requirement as provided by law;

(d)     has registered to vote in the manner prescribed by law; and

(e)     has not been disenfranchised by Article II, Section I, Paragraph III of the Georgia Constitution based on (i) a conviction for a felony involving moral turpitude (Art. II, § I, ¶ III(a)), or (ii) has been adjudicated mentally incompetent to vote (Art. II, § I, ¶ III(b)).

88.

By requiring that registered voters present a Photo ID before being issued a ballot and allowed to vote, both the 2005 Photo ID Act and the 2006 Photo ID Act violate Art. II, § I, ¶ II of the Georgia Constitution in either of two ways, (a) both the statutes purport to make presentation of a Photo ID a new condition and qualification of voting, or (b) to disenfranchise voters from voting even though

those voters who do not have a Photo ID are lawfully registered and possess each

of the qualifications set forth in Art. II, § I, ¶ II of the Georgia Constitution.

## Count Two

## Undue Burden on the Right to Vote in
## Violation of Equal Protection of the Law

89.

The allegations of paragraphs 1 through 88 above are hereby incorporated as

allegations of paragraph 89 of Count Two of the complaint.

90.

The Photo ID requirement in both the 2005 Photo ID Act and the 2006

Photo ID Act imposes an undue burden on the fundamental right of hundreds of

thousands of registered voters in Georgia to vote that is neither justified by, nor

necessary to promote a substantial and compelling state interest in a manner that is

permitted by Art. II, § II, ¶ II of the Georgia Constitution which was not already

being adequately protected by existing criminal laws and election procedures, or

which could not have been accomplished in other, less restrictive alternatives

without interfering with their right to vote in person. *Dunn v. Blumstein*, 405 U.S.

330 (1972); *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966).

91.

The Photo ID requirement in both the 2005 Photo ID Act and 2006 Photo ID Act is also overbroad and is not narrowly tailored to prevent what few documented instances of fraudulent voting that do exist (*i.e.*, fraudulent registration and fraudulent voting of absentee ballots), while making it significantly harder for hundreds of thousands of qualified citizens who vote in person to cast ballots in order to prevent a hypothetical – and so far as the evidence shows, is non-existent – possibility that a few individuals might attempt to vote illegally by misrepresenting their identity to poll workers.

## Count Three

### The 2005 Photo ID Act Imposes An Unconstitutional Poll Tax on the Right to Vote In Violation of Both the Fourteenth and the Twenty-Fourth Amendments

92.

The allegations of paragraphs 1 through 91 above are hereby incorporated as allegations of paragraph 92 of Count Three of the complaint.

93.

The 2005 Photo ID Act, in combination with O.C.G.A. § 40-5-103, imposes an unconstitutional $20 poll tax on the right to vote in federal, state and local elections in Georgia.

94.

Conditioning the right to vote in person or the payment of a $20 fee to purchase a Photo ID violates the equal protection clause in both the Georgia and United States Constitutions because the fee must be paid only by some voters (those who vote in person, but do not have passports, government employee ID cards, or Georgia driver's licenses) and not by others (absentee voters and voters who have passports, government employee ID cards or Georgia driver's licenses). *See Harper*, 383 U.S. at 663.

95.

Even if the $20 fee is not discriminatory, and applied uniformly to all voters, the Photo ID requirement is still invalid as applied to the right to vote in federal elections because it conflicts with the Twenty-Fourth Amendment.

> **Section 1.**  The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay a **poll tax or other tax**.

Amendment XXIV to the United States Constitution, Section 1 (emphasis added); *see Harman v. Forssenius*, 380 U.S. 528 (1965).

## **Count Four**

### **The 2006 Photo ID Act Also Imposes An Unconstitutional Poll Tax on the Right to Vote if it is Construed or Applied to Require a Voter to Pay a Fee for a Birth Certificate or Other Documents to Obtain a Georgia Voter Identification Card**

96.

The allegations of paragraphs 1 through 95 above are hereby incorporated as allegations of paragraph 96 of Count Four of the complaint.

97.

If O.C.G. A. § 21-2-417.1 (e) is construed or applied by one or more county registrars or boards of elections or by the State Election Board to require a voter to present a birth certificate or any other document which may be obtained from the State or any of its agencies or political subdivisions only by paying a fee, the 2006 Photo ID Act, as thus construed and applied, is an unconstitutional poll tax on the right to vote in person that violates both the Fourteenth and the Twenty-Fourth Amendments to the United States Constitution.

**Count Five**

**Violation of the Civil Rights Act of 1964
(42 U.S.C. §§ 1971(a)(2)(A) and 1971(a)(2)(B))**

98.

The allegations of paragraphs 1 through 97 above are hereby incorporated as allegations of paragraph 98 of Count Five of the complaint.

99.

The 2005 Photo ID Act and the 2006 Photo ID Act violate the Civil Rights Act of 1964, 42 U.S.C. § 1971(a)(2)(A), which provides that:

> No person acting under color of law shall –
>
> **(A)**  in determining whether any individual is qualified under State law or laws to vote in any election, **apply any standard**, practice, or procedure **different from the standards**, practices, or procedures **applied** under such law or laws to other individuals **within the same county**, parish, or **similar political subdivision** who have been found by State officials to be qualified to vote; . . .

42 U.S.C. § 1971(a)(2)(A) (emphasis added).

100.

Both Photo ID Acts violate 42 U.S.C. § 1971(a)(2)(A) because only voters who vote in person are required to present a Photo ID as a condition of being allowed to vote, while Georgia law imposes no such Photo ID requirement on

voters residing in the same "county" or "political subdivision" who vote by casting

absentee ballots.

101.

Both Photo ID Acts also violate the Civil Rights Act of 1964 (42 U.S.C.

§ 1971(a)(2)(B)), which provides that:

> No person acting under color of law shall –
>
> **(B)** deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, **if such error or omission is not material in determining whether such individual is qualified under State law to vote** in such election; **. . .**

102.

The Photo ID requirement in both Acts violates 42 U.S.C. § 1971(a)(2)(B)

because both statutes would deny individuals who are fully qualified and lawfully

registered the right to vote in person based solely on whether or not they have a

government-issued Photo ID, regardless of whether their identity may be known to

election officials, or established by other means, such as by presenting a Photo ID

card issued by a non-governmental employer or educational institution or nursing

or retirement home, or by presenting a copy of their official voter registration card,

or by comparing the voter's the signature on the Elector's Certificate with the

signature on the official voter registration card.

## Count Six

## Section 2 of the Voting Rights Act

### 103.

The allegations of paragraphs 1 through 102 above are hereby incorporated as allegations of paragraph 103 of Count Six of the complaint.

### 104.

Section 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973(a)) provides:

> (a)     No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

### 105.

Non-white citizens of Georgia, as a group, have on average, half the personal and family incomes than citizens of Georgia who are white, and three times as likely, as a group, to live in poverty as are citizens of Georgia who are white, and are three times less likely to have access to an automobile.

### 106.

The requirement in both the 2005 Photo ID Act and in the 2006 Photo ID Act that a voter must present a government-issued photo identity card in order to vote in person, is both a qualification for voting, and a standard, practice or

procedure with respect to voting, which will result in the denial of the right to vote of African-American and other minority plaintiffs, and others on account of race or color in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a).

## Irreparable Harm / Inadequate Remedy At Law

107.

Georgia is scheduled to conduct a primary election on July 18, 2006, a general election in November 7, 2006, for Governor, Lieutenant Governor, Secretary of State, Attorney General, and other state-wide constitutional offices, for members of the General Assembly, and for members of Congress, and a non-partisan general election for members of the Georgia Supreme Court, Court of Appeals, Superior and State Courts also on November 7, 2006.

108.

The individual plaintiff and the members of the organizational plaintiffs who do not have one of the forms of ID required by the 2005 Photo ID Act or the 2006 Photo ID Act will be irreparably harmed if they are forced, between now and the next election to either (a) obtain a Photo ID, or (b) forfeit their rights as registered voters to vote in the next and subsequent elections or referenda in their respective voting districts or political subdivisions for which they cannot be adequately compensated in an action at law for money damages.

WHEREFORE, Plaintiffs respectfully pray that:

(a)     the Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201

        declaring the Photo ID requirement in the amendment to O.C.G.A.

        § 21-2-417 in the 2005 Photo ID Act and the 2006 Photo ID Act to be

        unconstitutional, null and void;

(b)     the Court enter a preliminary and a permanent injunction pursuant to

        Fed.R.Civ.P. 65 restraining and enjoining defendants individually and

        in their official capacities from enforcing or applying the Photo ID

        requirement in the amendment to O.C.G.A. § 21-2-417 (the 2005

        Photo ID Act or the 2006 Photo ID Act) to deny plaintiffs or any other

        registered voter in Georgia admission to the polls, a ballot, or the right

        to cast their ballots and have their ballots counted in any special,

        general, run off or referenda election in Georgia because of their

        failure or refusal to present an official Photo ID required by O.C.G.A.

        § 21-2-417, as amended by either the 2005 Photo ID Act or the 2006

        Photo ID Act;

(c)     plaintiffs recover their reasonable attorneys' fees and costs pursuant to

        42 U.S.C. § 1988; and

(d)     plaintiffs have such other and further relief as may be just and

equitable.

This 23rd day of February, 2006.

Respectfully submitted,


_____/s/Emmet J. Bondurant_____
Emmet J. Bondurant
Georgia Bar No. 066900
David G.H. Brackett
Georgia Bar No. 068353
Sarah M. Shalf
Georgia Bar No. 637537
Jason J. Carter
Georgia Bar No. 141669

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309
Telephone:  404-881-4100
Facsimile:  404-881-4111
E-mail:       bondurant@bmelaw.com
              brackett@bmelaw.com
              shalf@bmelaw.com
              carter@bmelaw.com

                                    Edward Hine, Jr.
                                    Georgia Bar No. 355775

Suite 300, Box 5511
111 Bridgepointe Plaza
Rome, Georgia  30162-5511
Telephone:  706-291-2531
Facsimile:   706-291-1301

E-mail:        ehinejr@bellsouth.net

                                        Miles J. Alexander
                                        Georgia Bar No. 009000
                                        Seth A. Cohen
                                        Georgia Bar No. 175198
1100 Peachtree Street, NE
Suite 2800
Atlanta, Georgia  30309
Telephone:  404-815-6500
Facsimile:    404-815-6555
E-mail:        MAlexander@kilpatrickstockton.com
               SCohen@kilpatrickstockton.com

                                        Ralph I. Knowles
                                        Georgia Bar No. 426721
DOFFERMYRE, SHIELDS, CANFIELD,
     KNOWLES & DEVINE, LLC
1355 Peachtree Street
Suite 1600
Atlanta, Georgia  30309
Telephone:  404-881-8900
Facsimile:    404-881-3007
E-mail:        rknowles@dsckd.com

Gerald Weber
Georgia Bar No. 744878
Elizabeth Littrell
Georgia Bar No. 454949
Margaret F. Garrett
Georgia Bar No. 255865

ACLU  OF GEORGIA
70 Fairlie Street, SW
Suite 340
Atlanta, Georgia  30303
Telephone:  404-523-6201
Facsimile:   404-577-0181
E-mail:         gweber@acluga.org
                    blittrell@acluga.org
                    mgarrett@acluga.org

Neil Bradley
Georgia Bar No. 075125
Laughlin McDonald
Georgia Bar No. 489550
Meredith Bell-Platts
Georgia Bar No. 048948

ACLU SOUTHERN REGIONAL OFFICE
2600 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia  30303-1227
Telephone:  404-523-2721
Facsimile:   404-653-0331
E-mail:         nbradley@aclu.org
                    lmcdonald@aclu.org

132147

Jon Greenbaum
LAWYERS COMMITTEE FOR CIVIL
    RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, D.C.  20005
Telephone:  202-662-8315
Facsimile:   202-628-2858
E-mail:        jgreenbaum@lawyerscommittee.org

Kimberly Perkins
The National Association for the Advancement
    of Colored People (NAACP), Inc.
4805 M. Hope Drive
Baltimore, Maryland  21215-3297
Telephone:  410-580-5794

Theodore M. Shaw
Director-Counsel
Norman J. Chachkin
Debo P. Adegbile
NAACP Legal Defense & Educational
Fund, Inc.
99 Hudson Street, 16th floor
New York, NY 10013
Telephone:  212-965-2200
Facsimile:   212-226-7592

Tisha R. Tallman
Georgia Bar No. 696949
Southeast Regional Counsel
MALDEF, The Mexican American Legal Defense & Educational Fund
41 Marietta Street, Suite 1000
Atlanta, GA  30303
Telephone:  678-559-1071
Toll free:      877-4 MALDEF (1-877-462-5333)
Facsimile:   678-559-1079
E-mail:        ttallman@maldef.org

Daniel B. Kohrman
AARP FOUNDATION LITIGATION
601 E Street, N.W., Suite A4-240
Washington DC 20049
Telephone:  202-434-2064
Facsimile:  202-434-6424
E-mail:        dkohrman@aarp.org

**_Attorneys for Plaintiffs_**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I certify that this Second Amended

Complaint complies with the font and point selections set forth in Local Rule 5.1B.

This Second Amended Complaint has been prepared using Times New Roman font

(14 point).

_____/s/ Emmet J. Bondurant_____
Emmet J. Bondurant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND**

**INJUNCTIVE RELIEF** with the Clerk of Court using the CM/ECF system which

will automatically send email notification of such filing to opposing counsel as

follows:

> Stefan E. Ritter, Esq.
> Dennis R. Dunn, Esq.
> Department of Law
> State of Georgia
> 40 Capitol Square, SW
> Atlanta, Georgia  30334
> E-mail:      Stefan.Ritter@LAW.State.GA.US
>                   dennis.dunn@law.state.ga.us
>
> Mark H. Cohen, Esq.
> Troutman Sanders, LLP
> 5200 Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-2216
> E-mail:      mark.cohen@troutmansanders.com
>
> Anne W. Lewis, Esq.
> Strickland, Brockington, Lewis, LLP
> Midtown Proscenium, Suite 2000
> 1170 Peachtree Street, NE
> Atlanta, Georgia  30309
> E-mail:      awl@sbllaw.net

L. Branch Connelly, Esq.
Cook & Connelly
Cook Building
9989 South Commerce Street
P.O. Box 370
Summerville, Georgia  30747
E-mail:        bconn6@wavegate.com

Suzanne Hutchinson, Esq.
P.O. Box 580
Calhoun, Georgia  30703
E-mail:        shutchinson@gordoncounty.org

Thomas H. Manning, Esq.
Michael D. McCrae, Esq.
Smith, Shaw & Maddox, LLP
SunTrust Bank Building
P.O. Box 29
Rome, Georgia  30162-0029
E-mail:        tmanning@smithshaw.com
               mmcrae@smithshaw.com

Clifton M. Patty, Jr., Esq.
7731 Nashville Street
Ringgold, Georgia  30736
E-mail:        pattylaw@catt.com

H. Boyd Pettit III, Esq.
H. Boyd Pettit, PC
100 West Cherokee Avenue
Suite B
P.O. Box 1178
Cartersville, Georgia  30120
E-mail:        hboyd@innerx.net

Peter R. Olson, Esq.
Jenkins & Olson, PC
15 South Public Square
Cartersville, Georgia  30120
Telephone:  770-387-1373
E-mail:        polson@jnlaw.com

Robert H. Smalley III, Esq.
McCamy, Phillips, Tuggle & Fordham, LLP
411 W. Crawford Street
P.O. Box 1105
Dalton, Georgia  30722-1105
E-mail:        rsmalley@mccamylaw.com

Brad J. McFall, Esq.
Gammon, Anderson & McFall
105 Prior Street
P.O. Box 292
Cedartown, Georgia  30125-0292
E-mail:        bjm@gammonanderson.com

This 23rd day of February 2006.


            /s/ Emmet J. Bondurant
            Emmet J. Bondurant