IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Common Cause/Georgia,
League of Women Voters of
Georgia, Inc.,
The Central Presbyterian
Outreach and Advocacy
Center, Inc.,
Georgia Association of Black
Elected Officials, Inc.,
The National Association for the
Advancement of Colored
People (NAACP), through its
Georgia State Conference of
Branches,
Georgia Legislative Black Caucus,
Concerned Black Clergy of
Metropolitan Atlanta, Inc.,
Bertha B. Young, and
Eugene Taylor,

     Plaintiffs,

v.

Evon Billups, Superintendent
of Elections for the Board of
Elections and Voter Registration
for Floyd County and the City of
Rome, Georgia,
Tracy Brown, Superintendent of
Elections of Bartow County,
Georgia,

CIVIL ACTION FILE
NO. 4:05-CV-0201-HLM

FILED IN CLERK'S OFFICE
U.S.D.C. Rome

SEP 0 6 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

AO 72A
(Rev.8/82)

Gary Petty,
Michelle Hudson,
Amanda Spencer,
Ron McKelvey, and
Nina Crawford, Members of the
Board of Elections and
Registration of Catoosa County,
Georgia,
Judge John Payne, Superintendent
of Elections of Chattooga County,
Georgia,
Shea Hicks, Superintendent of
Elections for Gordon County,
Georgia,
Jennifer A. Johnson, Superintendent
of Elections for Polk County,
Georgia,
Individually and in their Respective
Official Capacities as Superintendents
or Members of the Elections Board
 in their Individual Counties, and
as Class Representatives, and
Karen Handel, individually and
in her official capacities as Secretary
of State of Georgia and Chair of the
Georgia Elections Board,

      Defendants,

and

the State Election Board,

      Intervenor-Defendant.

2

## ORDER

This case is an action to have the photo identification ("Photo ID") requirement set forth in Senate Bill 84 ("The 2006 Photo ID Act") declared unconstitutional both on its face and as applied, and to enjoin its enforcement on the ground that it imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of the Fourteenth and Twenty-Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. § 1971(a)(2)(A) and (a)(2)(B)), and Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)).  The case came before the Court on August 22 through August 24, 2007, for a bench trial on Plaintiffs' request for a permanent injunction.  This Order first sets forth the procedural background for the case, and then sets forth the Court's findings of fact and conclusions of law from the bench trial.

AO 72A

(Rev.8/82)

At the outset, the Court commends counsel on both sides of this case for their courteousness and professionalism. Counsel worked diligently to prepare this case for trial within a very short time frame, and managed to complete discovery in an equally short time frame with only minimal intervention by the Court. Counsel's preparation, diligence, competence, and professionalism all made the litigation of this case much easier for the Court and the parties.

## I.   Procedural Background

1.    On September 1, 2005, Plaintiffs filed this lawsuit. (Docket Entry No. 1.) Plaintiffs initially asserted that the Photo ID requirement in the 2005 Amendment to O.C.G.A. § 21-2-417 (Act. No. 53) ("The 2005 Photo ID Act") violated the federal and Georgia constitutions, was a poll tax that violated the Twenty-Fourth Amendment and the Equal Protection Clause, unduly burdened the fundamental right to vote, violated the Civil Rights Act of 1964, and violated Section 2 of the Voting Rights Act of 1965.

4

2. On September 19, 2005, Plaintiffs requested that the Court schedule a preliminary injunction hearing.

3. On that same day, the Court entered an Order scheduling a preliminary injunction hearing for October 12, 2005. (Order of Sept. 19, 2005.)

4. On October 6, 2005, Plaintiffs filed a formal Motion for Preliminary Injunction.

5. On October 7, 2005, former Secretary of State Cathy Cox and the State Election Board (the "State Defendants") filed a Motion to Dismiss Individual Capacity Claims.

6. On October 11, 2005, individual Plaintiff Tony Watkins filed a Stipulation of Dismissal Without Prejudice of his claims.

7. On October 12, 2005, Plaintiffs filed their First Amendment to Complaint, which addressed the issue of standing for the organizational Plaintiffs.

8. On October 12, 2005, the Court held a hearing with respect to Plaintiffs' Motion for Preliminary Injunction. (Oct. 12, 2005, Hr'g

5

Tr.)  During the October 12, 2005, hearing, the parties presented evidence and arguments in support of their respective positions. (Id.)

9. On October 18, 2005, the Court entered an Order granting Plaintiffs' Motion for Preliminary Injunction and finding that Plaintiffs had a substantial likelihood of success on their claims that the 2005 Photo ID Act unduly burdened the right to vote, and that the 2005 Photo ID Act constituted a poll tax.   (Order of Oct. 18, 2005.)

10.   On October 19, 2005, the Court denied the State Defendants' Motion to Dismiss Individual Capacity Claims. (Order of Oct. 19, 2005.)

11.   On October 20, 2005, the Court denied the State Defendants' Motion to Stay Preliminary Injunction Pending Appeal. (Order of Oct. 20, 2005.)

12.   The State Defendants appealed the October 18, 2005, Order to the United States Court of Appeals for the Eleventh

AO 72A

(Rev.8/82)

Circuit, requesting that the Eleventh Circuit stay the Court's October 18, 2005, Order pending resolution of the appeal.

13. On October 27, 2005, the Eleventh Circuit denied the State Defendants' Motion to Stay the October 18, 2005, Order pending resolution of the appeal.

14. In January 2006, the Georgia General Assembly passed the 2006 Photo ID Act, which Governor Purdue signed into law.

15. On February 23, 2006, Plaintiffs filed a Motion for Leave to File Second Amended Complaint.  In that Motion, Plaintiffs sought permission to amend their First Amended to Complaint to assert claims that both the 2005 Photo ID Act and the 2006 Photo ID Act violated the Georgia Constitution, the  federal Equal Protection Clause, the Fourteenth and Twenty-Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964, and Section 2 of the Voting Rights Act of 1965.

16. On March 2, 2006, the Court held a telephone conference with counsel to discuss the issues relating to preclearance of the

7

2006 Photo ID Act by the United States Department of Justice ("DOJ"). The Court stayed the proceedings in this case pending notification of the DOJ's decision concerning preclearance of the 2006 Photo ID Act. (Order of Mar. 2, 2006.)

17. On April 21, 2006, former Secretary of State Cox filed a Notice of Section 5 Preclearance of Act 432 (SB 84).

18. On that same day, the Court entered an Order lifting the stay in this case, and setting forth a briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction. (Order of Apr. 21, 2006.)

19. On April 26, 2006, Plaintiffs filed their Second Amended Complaint.

20. On May 5, 2006, Plaintiffs filed a Motion to Revise Scheduling Order of April 21, 2006, pending the State Election Board's adoption of rules and regulations implementing the 2006 Photo ID Act, and pending DOJ preclearance of those rules and regulations.

8

AO 72A
(Rev.8/82)

21. On that same day, the Court approved a Consent Order revising the briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction to require Plaintiffs to file that Motion within ten days after the rules and regulations adopted by the State Election Board received preclearance from the DOJ. (Order of May 5, 2006.)

22. On May 10, 2006, former Secretary of State Cox and the State Election Board filed a Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part.

23. On May 25, 2006, Plaintiffs filed a Second Motion for Order to Certify Questions of State Law to the Georgia Supreme Court.

24. On June 29, 2006, the Court entered an Order granting the Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part, dismissing Counts One and Three of Plaintiffs' Second Amended Complaint, as well as the portions of Counts Two, Five, and Six of Plaintiffs' Second

AO 72A
(Rev.8/82)

Amended Complaint that challenged the 2005 Photo ID Act. (Order of June 29, 2006.) In that same Order, the Court denied Plaintiffs' Second Motion for Order to Certify Questions of State Law to the Georgia Supreme Court. (Id.)

25. After the Court's June 29, 2006, Order, the following claims asserted in Plaintiffs' Second Amended Complaint remained pending. In Count Two of their Second Amended Complaint, Plaintiffs contended that the Photo ID requirement imposes an undue burden on the right to vote, in violation of the Equal Protection Clause. (Second Am. Compl. ¶¶ 89-91.) In Count Four of their Second Amended Complaint, Plaintiffs asserted that the 2006 Photo ID Act is an unconstitutional poll tax if it is construed or applied to require voters to pay a fee for a birth certificate or other documents to obtain a Georgia voter Photo ID card. (Id. ¶¶ 96-97.) In Count Five of their Second Amended Complaint, Plaintiffs alleged that the Photo ID requirement violates the Civil Right Act of 1964, as set forth in 42 U.S.C.A. §§ 1971(a)(2)(A) and

10

1971(a)(2)(B).   (Id. ¶¶ 98-102.)   Finally, in Count Six of their Second Amended Complaint, Plaintiffs asserted that the Photo ID requirement violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973(a).  (Id. ¶¶ 103-106.)

26.  On July 5, 2006, Plaintiffs filed their Second Motion for Preliminary Injunction.  Plaintiffs sought to have the 2006 Photo ID Act declared invalid, both on its face and as applied, and to enjoin its enforcement.  Plaintiffs contended that the 2006 Photo ID Act imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of article II, section I, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty-Fourth Amendments to the United States Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. §§ 1971(a)(2)(A) and (a)(2)(B)), Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)), and 42 U.S.C.A. §§ 1983 and 1988.  Plaintiffs requested that the Court enter a preliminary injunction that prohibits Defendants from: (1)

11

AO 72A

(Rev.8/82)

enforcing or attempting to enforce or apply the 2006 Photo ID Act and the regulations issued by the State Election Board under that Act at any elections in Georgia; or (2) discouraging, interfering with, or preventing any person who is lawfully registered from voting in person in any such elections, pending a final trial on the merits or a further Order from the Court.  Plaintiffs requested that the Court enjoin Defendants "and [that] all state or local election officials be further enjoined from making any public announcement or statements or other communications that advise registered voters or election officials in Georgia that registered voters may not cast a ballot in any election if the voter does not have one of the forms of photo identification specified in the 2006 Photo ID Act." (Pls.' Mot. Second Prelim. Inj. at 2.)  Plaintiffs also asked the Court to order and direct Defendants "to send prompt written notice to each of the 675,000 registered voters who have been identified by the Secretary of State as not having Georgia driver's licenses, informing them that they are not required to present photographic

12

identification as a condition to being admitted to the polls or allowed to vote and that they will not be discouraged, interfered with, or otherwise prevented from voting in person by defendants or other election officials on the ground that they are unable to present photographic identification to election officials at the polls." (Id. at 2-3.)

27.  On July 7, 2006, the State Election Board filed a Motion to Dismiss Plaintiffs' Second Motion for Preliminary Injunction and to Cancel Hearing.  That Motion to Dismiss followed a temporary restraining order issued by the Superior Court of Fulton County, Georgia, on July 7, 2006,  enjoining the defendants in that case from enforcing the 2006 Photo ID Act during the July 18, 2006, primary election or any resulting run-off election.  Lake v. Perdue, Civil Action File No. 2006CV119207, slip op. at 3-4 (Fulton County Super. Ct. July 7, 2006.)  The plaintiffs in Lake had argued that the 2006 Photo ID Act violated the Georgia Constitution.

13

28.  On July 10, 2006, following a telephone conference with counsel, the Court entered an Order indicating that the Court would postpone the July 12, 2006, preliminary injunction hearing in this case if the Supreme Court of Georgia entered an Order denying the Lake defendants' request to stay the temporary restraining order in that case prior to July 12, 2006.  (Order of July 12, 2006.)

29.  On July 12, 2006, the Court held a hearing concerning Plaintiffs' Second Motion for Preliminary Injunction. (July 12, 2006, Hr'g Tr.)  Near the conclusion of the hearing, counsel received information that the Georgia Supreme Court had denied the Lake defendants' request to stay the temporary restraining order in that case, leaving the temporary restraining order in place for at least thirty days.  (Id.)

30.  At the conclusion of the July 12, 2006, hearing, the Court orally granted Plaintiffs' Second Motion for Preliminary Injunction with respect to Plaintiffs' claim under the Equal Protection Clause. (July 12, 2006, Hr'g Tr.)  On July 14, 2006, the Court entered a

14

AO 72A
(Rev.8/82)

written Order that formally set forth the Court's findings and conclusions concerning Plaintiffs' Second Motion for Preliminary Injunction. (Order of July 14, 2006.) The Court granted Plaintiffs' Second Motion for Preliminary Injunction solely with respect to the July 2006 primary elections and associated run-offs, reasoning that 2006 Photo ID Act posed an undue burden on certain voters with respect to those elections. (Id.) The Court declined to extend the preliminary injunction to cover subsequent elections, reasoning that if the State Defendants continued their education efforts with respect to the 2006 Photo ID Act, the requirements of that Act might no longer prove unduly burdensome for voters in subsequent elections. (Id.)

31.   After the Court's July 14, 2006, Order, and after the Georgia Supreme Court's refusal to stay the temporary restraining order issued in the Lake case, the State Defendants stopped all of their attempts to educate voters concerning the 2006 Photo ID Act.

AO 72A
(Rev.8/82)

In early September 2006, the State Election Board voted to resume those educational efforts.

32.   On September 5, 2006, the Court held a telephone conference with the parties to address Plaintiffs' concerns with respect to the educational efforts  and the application of the 2006 Photo ID Act to the September 2006 special elections.

33.  On September 6, 2006, Plaintiffs filed their Motion for Hearing on Plaintiffs' Second Motion for Preliminary Injunction in Advance of the September 2006 special elections.

34.   On September 14, 2006, the Court held its third preliminary injunction hearing in this case. (Sept. 14, 2006, Hr'g Tr.)  At the conclusion of the September 14, 2006, hearing, the Court verbally granted Plaintiffs' request for a preliminary injunction with respect to the September 2006 special elections.  (Id.)

35.  On September 26, 2006, the State Defendants filed a Motion to Stay Proceedings Pending Resolution of Appeal of the Superior Court of Fulton County's Declaratory Judgment and

16

Permanent Injunction to the Georgia Supreme Court. (Docket Entry No. 144.) On September 28, 2006, the Court granted that Motion. (Order of Sept. 28, 2006.)

36. On June 11, 2007, the Georgia Supreme Court issued its decision in Perdue v. Lake, 647 S.E.2d 6 (Ga. 2007). In that decision, the Georgia Supreme Court concluded that the plaintiff in Lake lacked standing because she possessed a MARTA card that was acceptable for in-person voting under the 2006 Photo ID Act, and vacated the Fulton County Superior Court's determination that the 2006 Photo ID Act violated the Georgia Constitution. Lake, 647 S.E.2d at 8. On July 27, 2007, the Georgia Supreme Court denied a request for reconsideration by the plaintiff. (Docket Entry No. 151-3.)

37. On July 27, 2007, the State Defendants filed a Motion for Order Lifting Stay of Proceedings and Setting Trial on Merits. (Docket Entry No. 151.) On August 1, 2007, the Court granted that Motion. (Order of Aug. 1, 2007.)

17

AO 72A
(Rev.8/82)

38.  On August 2, 2007, the Court entered an Order directing the parties and their counsel to appear before the Court on August 22, 2007, for a final trial on the merits.  (Order of Aug. 2, 2007.)

39.  On August 13, 2007, Plaintiffs filed a Motion for Leave to Amend to Add Plaintiffs and to Reflect the Substitution of a Defendant.  (Docket Entry No. 159.)  Plaintiffs sought to amend their Second Amended Complaint to add new individual plaintiffs in light of the Georgia Supreme Court's finding that a MARTA card is an acceptable form of Photo ID for purposes of the 2006 Photo ID Act, the lone individual Plaintiff, Clara Williams, lacked standing to pursue this action because she had a MARTA card.  (Id.) Plaintiffs also sought to substitute the current Georgia Secretary of State, Karen Handel, for the former Georgia Secretary of State, Cathy Cox.  (Id.)

40.  On August 14, 2007, the State Defendants filed a Motion to Dismiss Plaintiff Clara Williams for Lack of Standing.  (Docket Entry No. 166.)

18

AO 72A
(Rev.8/82)

41.   On August 16, 2007, counsel for Plaintiffs filed a new lawsuit challenging the 2006 Photo ID Act.  Young v. Billups, Civil Action File No. 4:07-CV-0163-HLM.  Plaintiffs sought to add the named plaintiffs in the Young case as individual Plaintiffs in this lawsuit.   On August 17, 2007, the Young Plaintiffs filed an Emergency Motion to Consolidate the Young case with the instant case.

42.  On August 17, 2007, the Court entered an Order granting Plaintiffs' Motion for Leave to Amend, and allowed Plaintiffs to add Bertha B. Young and Eugene Taylor as individual Plaintiffs and to substitute current Secretary of State Karen Handel for former Secretary of State Cox.  (Order of Aug. 17, 2007.)  The Court denied as moot the Emergency Motion to Consolidate the Young case with this one.  (Id.)  On that same day, the Court granted the State Defendants' Motion to Dismiss Plaintiff Clara Williams for Lack of Standing, and dismissed Plaintiff Williams from this suit.  (Id.)

19

43. On August 22, 2007, the case proceeded to a bench trial. The bench trial concluded on August 24, 2007. During the bench trial, the Court orally granted the State Defendant's Motion for a Directed Verdict, and dismissed six organizational Plaintiffs, including Common Cause/Georgia, the League of Women Voters of Georgia, Inc., The Central Presbyterian Outreach and Advocacy Center, Inc., the Georgia Association of Black Elected Officials, Inc., the Georgia Legislative Black Caucus, and Concerned Black Clergy of Metropolitan Atlanta, Inc., for lack of standing. The Court denied the Motion with respect to Plaintiffs Young and Taylor and Plaintiff NAACP, but indicated that it would reconsider the question of standing after the conclusion of the trial.

44. During the bench trial, Plaintiffs proceeded forward only on their claim that the 2006 Photo ID Act unduly burdens their right to vote, in violation of their equal protection rights. This Order therefore addresses only that claim and the question of standing.

20

AO 72A
(Rev.8/82)

## II.    Findings of Fact

### A.    History of the 2006 Photo ID Act

1.    Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present identification as a condition of voting. In 1997, the Georgia General Assembly adopted O.C.G.A. § 21-2-417, which required registered voters in Georgia to identify themselves by presenting one of seventeen forms of identification to election officials as a condition of being admitted to the polls and of being allowed to vote.   Prior to its amendment in 1997, O.C.G.A. § 21-2-417 permitted, but did not require, registered voters to present a Georgia driver's license or other form of official photographic identification as a method of identification as a condition of voting. Under the version of O.C.G.A. § 21-2-417 as amended in 1997, voters remained free to use any of eight other methods of identification for voting, including a birth certificate, a social security card, a copy of a current utility bill, a government check, a payroll

21

check, or a bank statement showing the voter's name and address. Additionally, voters who did not have, or could not find, one of the seventeen forms of identification specified in former O.C.G.A. § 21-2-417(a), were entitled to be admitted to the polls, to be issued a ballot, and to be allowed to vote simply by signing a statement under oath swearing or affirming that he or she is the person identified on the elector's certificate.

2. In 2005, the Georgia General Assembly adopted House Bill 244, or Act 53 ("HB 244"), which amended O.C.G.A. § 21-2-417 to require that all registered voters in Georgia who vote in person in all primary, special, or general elections for state, national, and local offices held on or after July 1, 2005, present a government-issued Photo ID to election officials as a condition of being admitted to the polls and before being issued a ballot and being allowed to vote.   The Georgia House of Representatives approved the Conference Committee Report on Act 53. Eighty-nine Republicans and two Democrats voted for HB 244, while seventy-two Democrats

22

and three Republicans voted against it.  The Georgia Senate adopted the Conference Committee Report on Act 53, with thirty-one Republicans and no Democrats voting in favor of it and eighteen Democrats and two Republicans voting against it.  (Id.)

   3. On April 22, 2005, Governor Sonny Perdue signed HB 244, and the Photo ID requirement of HB 244 became effective on July 1, 2005, subject to pre-clearance by the United States Department of Justice.  The Photo ID requirement of HB 244 was codified in O.C.G.A. § 21-2-417.  HB 244 also eliminated the requirement that voters seeking to vote via absentee ballot by mail provide one of several statutory excuses in order to obtain an absentee ballot.

   4.  In January 2006, a majority of legislators in the Georgia House of Representatives and the Georgia Senate adopted the 2006 Photo ID Act.  The 2006 Photo ID Act repealed the 2005 Photo ID Amendment, replacing it with identical Photo ID requirements for in-person voting and a new code section, O.C.G.A. § 21-2-417.1, which requires the Board of Elections in

23

each county to issue a "Georgia voter identification card" containing a photograph of the voter, without charge to voters residing in the county, upon presentation of certain identifying documents. The 2006 Photo ID Act amended O.C.G.A. § 40-5-103 by striking the previous subsection (d) in the 2005 Photo ID Act, which had required a voter to execute an affidavit of poverty to obtain a Photo ID without charge from the Department of Drivers Services ("DDS"). In its place, the 2006 Act substituted a requirement that the voter swear "that he or she desires an identification card in order to vote . . . and that he or she does not have any other form of identification that is acceptable under Code § 21-2-417" and to "produce evidence that he or she is registered to vote in Georgia."

5. On January 9, 2006, the first day of the 2006 legislative session, the House Committee on Governmental Affairs of the Georgia House of Representatives approved SB 84 by a straight party-line vote of seven to three, sending the bill to the floor of the House.

AO 72A

(Rev.8/82)

24

6. On January 24, 2006, the Senate passed SB 84 by a vote of thirty-two to twenty-two, with two members excused. Thirty-two Republicans voted in favor of it, and twenty-one Democrats and one Republican voted against it. On January 25, 2006, the House of Representatives passed SB 84 by a vote of 111 to sixty, with three members excused. Ninety-eight Republicans and thirteen Democrats voted in favor of it, while sixty Democrats voted against it. On January 26, 2006, Georgia's Governor, Sonny Perdue, signed the Act. The Georgia General Assembly refused to delay the effective date of the 2006 Photo ID Act until after the 2006 primary and general elections. On April 21, 2006, the DOJ precleared the 2006 Photo ID Act.

7. The 2006 Photo ID Act changed O.C.G.A. § 40-5-103(d)(1) to eliminate the affidavit of indigency requirement. That portion of the statute now provides:

> The department shall not be authorized to collect a fee for an identification card from any person:

25

AO 72A
(Rev.8/82)

(1)   Who swears under oath that he or she desires an identification card in order to vote in a primary or election in Georgia, and that he or she does not have any other form of identification that is acceptable under Code Section 21-2-417 for identification at the polls in order to vote; and

(2)   Who produces evidence that he or she is registered to vote in Georgia.

This subsection shall not apply to a person who has been issued a driver's license in this state.

O.C.G.A. § 40-5-103(d).

8. The 2006 Photo ID Act also amended the text of O.C.G.A. § 21-2-417.  O.C.G.A. § 21-2-417 currently provides:

(a)   Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:

26

(1)   A Georgia driver's license which was properly issued by the appropriate state agency;

(2)   A valid Georgia voter identification card issued under Code Section 21-2-417.1 or other valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;

(3)   A valid United States passport;

(4)   A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A   valid   United   States   military identification   card,   provided   that   such identification card contains a photograph of

27

the elector; or

(6) A valid tribal identification card containing a photograph of the elector.

(b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

(c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21-2-200, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section

AO 72A

(Rev.8/82)

or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

O.C.G.A. § 21-2-417.

9. The 2006 Photo ID Act also added O.C.G.A. § 21-2-417.1, which provides:

(a)   Each county board of registrars shall provide at least one place in the county at which it shall accept applications for and issue Georgia voter identification cards to registered Georgia electors which shall under

29

state law be valid only for purposes of voter identification under Code Section 21-2-417 and available only to registered electors of this state. No fee shall be charged or collected for the application for or issuance of a Georgia voter identification card.

(b)   No person shall be eligible for a Georgia voter identification card if such person has a valid unexpired driver's license or identification card issued under Code Section 40-5-100.

(c)   The Georgia voter identification card shall be captioned 'GEORGIA VOTER IDENTIFICATION CARD' and shall contain a prominent statement that under Georgia law it is valid only as identification for voting purposes. The Georgia voter identification card shall be laminated, shall contain a digital photograph of the applicant, and shall include the following information:

    (1)   Full legal name;
    (2)   Address of residence;
    (3)   Birth date;
    (4)   Date identification card was issued;
    (5)   Sex;
    (6)   Height;
    (7)   Weight;

AO 72A

(Rev.8/82)

(8)   Eye Color;

(9)   County where the identification card was issued including a county number to be assigned for each county by the Secretary of State; and

(10) Such other information or identification as required by rule of the State Election Board.

(d)   The application for a Georgia voter identification card shall elicit the information required under subsection (c) of this Code section and such other information as may be required by rule of the State Election Board.  The application shall be signed and sworn to by the applicant and any falsification or fraud in the making of the application shall constitute a felony offense under Code Section 16-10-71, relating to the offense of false swearing.

(e)   The board of registrars shall require presentation and verification of the following information before issuing a Georgia voter identification card to a person:

(1)   A photo identity document, except that a nonphoto identity document is acceptable if it includes both the person's full legal name and

31

date of birth;

(2)   Documentation showing the person's date of birth;

(3)   Evidence that the person is registered to vote in this state; and

(4)   Documentation showing the person's name and address of principal residence.

(f)   A Georgia voter identification card shall remain valid so long as a person resides at the same address and remains qualified to vote.  It shall be the duty of a person who moves his or her residence within the State of Georgia to surrender his or her card to the board of registrars of the county of his or her residence; and such person may after such surrender apply for and receive a new card if such person is otherwise eligible under this Code section.  It shall be the duty of a person who moves his or her residence outside the State of Georgia or who ceases to be qualified to vote to surrender his or her card to the board of registrars by which it was issued.

(g)   The State Election Board shall provide each county board of registrars with the necessary equipment, forms,

AO 72A

(Rev.8/82)

supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.

(h)   The State Election Board shall adopt rules and regulations for the administration of this Code section and, without limiting the generality of the foregoing, such rules and regulations may further define or prescribe the types of documentation required under subsection (e) of this Code section.

O.C.G.A. § 21-2-417.1.

10.  On June 22, 2006, the State Board of Elections adopted rules and regulations to implement the 2006 Photo ID Act.   The State submitted the rules and regulations to the DOJ for review, and the DOJ precleared the rules and regulations on June 27, 2006.   The rules and regulations provide:

183-1-20.01    Georgia Voter Identification Card

(1)   Intent and Purpose.  These rules are promulgated pursuant to the authority granted the State Election Board under O.C.G.A. §§ 21-2-417.1 and 21-2-31.  It is the intent of the State Election Board to provide for the

33

time, place and manner in which each county Board of Registrars shall issue the Georgia Voter Identification Card to eligible electors and to provide for the acceptable types of documentation necessary to obtain a Georgia Voter Identification Card. To this end, the State Election Board has promulgated these rules and regulations.

(2)   Application for the Georgia Voter Identification Card. Beginning with the July 18, 2006 Party Primary Election each county registrar shall provide the application for the Georgia Voter Identification Card in the form designed and published by the State Election Board or its member designee(s). Any registered voter who meets the criteria in O.C.G.A. § 21-2-417.1 and wishes to obtain a Georgia Voter Identification Card shall be required to submit the information requested in such application. It shall be the responsibility of each county registrar to ensure that each accepted application is complete.

(3)   Availability of the Georgia Voter Identification Card

(a)   Each county shall provide a place within the voter registrar's primary or main office location, as previously approved by the

34

Department of Justice, to process applications for Georgia Voter Identification Cards and to process and distribute such cards.

(b)   Each county registrar's office may provide additional locations or extended hours for processing applications for the Georgia Voter Identification Card and processing and distributing the cards but shall be required to comply with criteria for establishment of additional voter registration places as outlined in 183-1-6-.03(3).

(c)   Each county registrar's office shall be open a minimum of eight hours per day on Monday through Friday of the week before the final primary, election, or run-off election day, except for legally observed holidays, and shall otherwise be open during normal business hours of the office in order to allow registered voters to apply for and obtain a Georgia Voter Identification Card.

(d)   The voter registrar's office of each county shall provide the application and process the Georgia Voter Identification Card using the

35

equipment, forms, supplies, and written training materials and/or verbal training provided by the State Election Board.

(e)   Each county Board of Registrars shall sign and maintain an intergovernmental agreement provided by the State Election Board outlining the use of the equipment.

(4)   Documentation required for application and issuance of the Georgia Voter Identification Card.

(a)   In accordance with O.C.G.A. § 21-2-417.1(e), the Board of Registrars shall require the presentation and verification of the following information before issuing a Georgia Voter Identification Card:

1.   A photo identity document, except that nonphoto identity document is acceptable if it includes both the applicant's full legal name and date of birth;

2.   Documentation showing the applicant's date of birth;

36

3.    Evidence that the applicant is registered to vote in the State of Georgia, either by voter precinct card, a new voter registration application or confirmation of voter's record on the statewide voter registration system or by verifying the original application in the voter registrar's office; and

4.    Documentation showing the applicant's name and principal residence address.

(b)    In determining whether the requirements of O.C.G.A. § 21-2-417.1(e) have been met, the following shall apply:

1.    Any of the following which contains a photograph of the applicant shall constitute a photo identity document, as provided in O.C.G.A. § 21-2-417.1(e)(1):

(i)    Student ID Card including public or private high school, college, university, or vocational school;

(ii)    Transit Card;

(iii)    Pilot's License;

(iv)    Nursing Home Identification Card;

37

(v)   Employee Identification Card;

(vi) Government Housing Authority Identification Card;

(vii) Any government issued license;

(viii) Any card accepted by local, state or federal government for the provision of benefits; or

(ix) Any card accepted by local, state or federal government for access to buildings.

2.   Any of the following shall constitute a nonphoto identity document in lieu of a photo identity document as provided in O.C.G.A. § 21-2-417.1(e)(1) only if it includes both the applicant's full legal name and date of birth:

(i)   Original birth certificate or certified copy of birth certificate;

(ii)   Certificate of birth registration;

(iii)   Voter Registration Application;

(iv) Copy of records filed in court by the applicant or on behalf of the applicant by the applicant's counsel;

(v)   Naturalization documents;

(vi) Copy of Marriage License Application;

(vii) A copy of the applicant's State or Federal

38

Tax Return filed for the previous calendar year;

(viii) Any other document issued by local, state, or federal government so long as the document provides a reasonably reliable confirmation of the identity of the applicant;

(ix)   Paycheck or paycheck stub bearing the imprinted name of the applicant's employer;

(x)   An original of the annual social security statement received by the applicant for current or preceding calendar year;

(xi)   An original of a Medicare or Medicaid statement received by the applicant;

(xii)   Certified school record or transcript for current or preceding calendar year;

(xiii) Hospital birth certificate;

(xiv) An authenticated copy of a doctor's record of post-natal care; or

(xv)   A federal Affidavit of Birth, form DS-10.


3.   The   registrar   shall   accept   as documentation showing the applicant's date of birth under O.C.G.A. § 21-2-417.1(e)(2) any of the documents described in subparagraph (b)2 above.

4.    The registrar shall accept as proof of voter registration under O.C.G.A. § 21-2-417.1(e)(3) the applicant's voter registration application or a voter's precinct card.

5.    Any of the documents described in subparagraphs (b)(1) and (2) shall be acceptable as documentation showing the applicant's name and address of principal residence under O.C.G.A. § 21-2-417.1(e)(4) if the documentation contains the applicant's name and address of principal residence. In addition, the registrar shall also accept the following as documentation showing the applicant's name and address of principal residence if the applicant's name and address of principal residence appears on the document:

(i)    Voter Precinct Card;

(ii)    Utility or cable bill issued within the last sixty (60) days;

(iii)    Bank statement issued within the last sixty (60) days;

(iv)    Currently valid rental contracts and/or receipts for payments made within the last

40

sixty (60) days for rent payments;

(v)   A copy of the applicant's State or Federal income tax return filed for the preceding calendar year;

(vi)   Homeowners insurance policy or bill for current or preceding calendar year;

(vii)   Mortgage, payment coupon, deed, or property tax bill for current or preceding calendar year;

(viii)   Current Automobile Registration Receipt;

(ix)   Homestead Exemption documentation; or

(x)   W-2 for the preceding calendar year.

6.   The application and supporting documentation of any applicant who is denied a Georgia Voter Identification Card shall be immediately forwarded via facsimile and U.S. mail to the State Election Board for automatic review to determine if the applicant has provided reasonably reliable documentary indicia confirming the identity of the applicant in which case the State Election Board shall direct the voter registrar to issue the Georgia Voter Identification Card.

41

## B.   Individual Plaintiffs and Others Claiming Injury

### 1.   Plaintiff Bertha B. Young

11.  Plaintiff Bertha B. Young lives in Rome, Georgia.  (Aug. 22, 2007, Trial Tr. at 8-9.)

12.  Plaintiff Bertha B. Young is seventy-eight years old.  (Aug. 22, 2007, Trial Tr. at 9.)

13.   Plaintiff Bertha B. Young asserts that she has been registered to vote for the last fifteen to twenty years.  (Aug. 22, 2007, Trial Tr. at 10.)

14.   Plaintiff Bertha B. Young voted in the last presidential election. (Aug. 22, 2007, Trial Tr. at 10)  Plaintiff Bertha B. Young does not know how many times she has voted.  (Id.)

15.   Plaintiff Bertha B. Young's regular polling place is approximately one block from her home, and she can walk to it. (Aug. 22, 2007, Trial Tr. at 10, 19)  Alternatively, Plaintiff Bertha B. Young can obtain a ride from her sons or a friend to the polling place.  (Id. at 13.)

AO 72A

(Rev.8/82)

16.   Plaintiff Bertha B. Young has no driver's license or passport, and has not served in the military or as a state, city, or county employee.  (Aug. 24, 2007, Trial Tr. at 10-11.)   Plaintiff Bertha B. Young has a photo identification card issued by the City of Rome Police Department approximately thirty years ago.  (Id. at 11.)  Plaintiff Bertha B. Young obtained that identification card to enable her to draw social security benefits after her husband died. (Id.)

17.  Plaintiff Bertha B. Young has four children, one of whom lives in Rome, Georgia.  (Aug. 22, 2007, Trial Tr. at 11-12, 15.)

18. Plaintiff Bertha B. Young had surgery on her right eye in March 2007, and needs surgery on her left eye.  (Aug. 22, 2007, Trial Tr. at 12.)  Plaintiff Bertha B. Young has difficulty in reading small print, as her eyes begin to water.  (Id.)

19.  Plaintiff Bertha B. Young does not drive; however, she rides a bus, takes a cab, or gets her sons to drive her.  (Aug. 22, 2007, Trial Tr. at 12-13.)  According to Plaintiff Bertha B. Young,

43

her sons will take her anywhere she wants to go. (Id. at 15.) Plaintiff Bertha B. Young also has friends who will drive her places. (Id.) In fact, Plaintiff Bertha B. Young uses a bank that is across town from her residence, and her friends and family members drive her there. (Id. at 16-17.)

20. Plaintiff Bertha B. Young sometimes works two days per week; on those occasions, her employer, who is one of Plaintiffs' counsel, pays someone to give her a ride.[1] (Aug. 22, 2007, Trial Tr. at 14-15.)

21. Plaintiff Bertha B. Young does not have a Voter Identification Card ("Voter ID Card"). To obtain a Voter ID Card, Plaintiff Bertha Young could ride a bus to the registrar's office in downtown Rome, which is approximately two miles from her home. (Aug. 22, 2007, Trial Tr. at 13, 22.) According to Plaintiff Bertha B. Young, a bus trip from her home to the registrar's office would take her approximately one hour, and a trip home from the registrar's

---

[1] Plaintiff Bertha B. Young testified that she works for Attorney Edward Hine, Jr.'s family. (Aug. 22, 2007, Trial Tr. at 15.)

AO 72A

(Rev.8/82)

office would take her approximately another hour.  (Id. at 13-14.)

Plaintiff Bertha B. Young, however, testified that her son or a friend

also could drive her.  (Id. at 21.)

22.  Plaintiff Bertha B. Young feels that she should not have

to obtain a Voter ID card, as she uses her police identification card

to cash checks.  (Aug. 22, 2007, Trial Tr. at 14.)  If the Court

upholds the 2006 Photo ID Act, however, Plaintiff Bertha B. Young

can and will obtain a Voter ID card.  (Id. at 14-15, 23.)

23.  Plaintiff Bertha B. Young received a letter from Secretary

of State Handel during the week of August 13, 2007.  (Aug. 22,

2007, Trial Tr. at 13, 21.)  Plaintiff Bertha B. Young read some of

the letter and could understand most of it.  (Id.)

24.  Plaintiff Bertha B. Young listens to the radio and watches

television every day.  (Aug. 22, 2007, Trial Tr. at 17.)  Plaintiff

Bertha B. Young also reads the local paper, the Rome News-

Tribune.  (Id.)

25.  Plaintiff Bertha B. Young can read and write.  (Aug. 22,

45

2007, Trial Tr. at 19.)  Plaintiff Bertha B. Young also can sign her name and write her address.  (Id.)

26.  Plaintiff Bertha B. Young sends, receives, and reads mail. (Aug. 22, 2007, Trial Tr. at 19-20.)

27.  Plaintiff Bertha B. Young understands that she could obtain an absentee ballot without giving a reason.  (Aug. 22, 2007, Trial Tr. at 20.)  Plaintiff Bertha B. Young has never voted absentee.  (Id. at 20, 24.)

28.  Plaintiffs' counsel asked Plaintiff Bertha B. Young to become involved in this lawsuit.  (Aug. 22, 2007, Trial Tr. at 20.)

### 2.   Plaintiff Eugene Taylor

29.   Plaintiff Eugene Taylor resides in Screven County, Georgia. (Aug. 22, 2007, Trial Tr. at 52.)

30.  Plaintiff Eugene Taylor traveled to Rome to testify at the bench trial.   (Aug. 22, 2007, Trial Tr. at 52.)   The trip took approximately four hours.  (Id.)

31.   Plaintiff Eugene Taylor quit school in the fifth grade

because he had to help care for his siblings after his father died. (Aug. 22, 2007, Trial Tr. at 55-56.) Plaintiff Eugene Taylor testified that he reads a little, and that he can write his name, although writing is difficult. (Id. at 56.)

32. Plaintiff Eugene Taylor has never used a computer. (Aug. 22, 2007, Trial Tr. at 56.) Plaintiff Eugene Taylor watches television, and generally watches Augusta, Georgia, channels. (Id. at 56-57, 68.) Plaintiff Eugene Taylor also listens to a gospel radio program on Sunday mornings that is broadcast by a South Carolina radio station. (Id. at 57, 69.)

33. Plaintiff Eugene Taylor does not have a Photo ID. (Aug. 22, 2007, Trial Tr. at 57.)

34. Plaintiff Eugene Taylor does not drive. (Aug. 22, 2007, Trial Tr. at 57, 62.) Plaintiff Eugene Taylor's daughter takes him places if he needs to go somewhere. (Id. at 57, 63.) Plaintiff Eugene Taylor's daughter has a job. (Id. at 58.)

35. Plaintiff Eugene Taylor's daughter picks up his medicine

47

and his groceries.  (Aug. 22, 2007, Trial Tr. at 59.)

36.  Plaintiff Eugene Taylor cashes checks at his bank, but does not need a Photo ID to cash those checks because the tellers know who he is.  (Aug. 22, 2007, Trial Tr. at 58.)

37.  Plaintiff Eugene Taylor works a couple of times a month on a farm.  (Aug. 22, 2007, Trial Tr. at 67-68.)  On those occasions, someone comes and gets Plaintiff Eugene Taylor and brings him home.  (Id.)

38.  Plaintiff Eugene Taylor is registered to vote, and he has voted.  (Aug. 22, 2007, Trial Tr. at 59.)  According to Plaintiff Eugene Taylor, he last voted in the 1980s.  (Id. at 59, 65-66.) Plaintiff Eugene Taylor voted for the current Screven County sheriff, and, if the sheriff ran again, Plaintiff Eugene Taylor would vote for him.  (Id. at 59.)

39.  Plaintiff Eugene Taylor's polling place is at the senior citizen's center, which is approximately seven miles from his house. (Aug. 22, 2007, Trial Tr. at 60-61, 66.)  The registrar's office, which

48

is located at the county courthouse, is approximately the same distance from Plaintiff Eugene Taylor's house.  (Id. at 67.)

40.  Plaintiff Eugene Taylor has never voted by mail, and does not think he would do so. (Aug. 22, 2007, Trial Tr. at 62.)  Plaintiff Eugene Taylor's daughter would help him vote by mail. (Id. at 74.)

41.   Plaintiff Eugene Taylor is aware of the Photo ID requirement. (Aug. 22, 2007, Trial Tr. at 63.)  If the Court upholds the Photo ID requirement, Plaintiff Eugene Taylor can obtain a Voter ID card by going to his local registrar's office.  (Id. at 64.) Plaintiff Eugene Taylor's daughter will take him to the registrar's office, but she may need to take time off from work to do so.  (Id.)

42.  Plaintiff Eugene Taylor learned of this lawsuit through his grandson, who attended law school with one of Plaintiffs' counsel. (Aug. 22, 2007, Trial Tr. at 70.)[2] Plaintiff Eugene Taylor first learned of this case approximately two or three months ago.  (Id.)

43.   In response to questioning from Plaintiffs' counsel,

---

[2]Plaintiff Eugene Taylor's grandson was a law school classmate of Jason Carter, one of Plaintiffs' attorneys. (Aug. 22, 2007, Trial Tr. at 70.)

49

AO 72A

(Rev.8/82)

Plaintiff Eugene Taylor indicated that he had joined Plaintiff NAACP at some point. (Aug. 22, 2007, at 72-73.) Plaintiff Eugene Taylor does not remember when he joined Plaintiff NAACP, and could provide only vague details about joining Plaintiff NAACP. (Id.) Plaintiff Eugene Taylor failed to indicate whether he still is a member of Plaintiff NAACP. (Id.) The Court finds that this testimony is, at best, equivocal, and finds that Plaintiff Eugene Taylor's testimony on this issue was not credible. Consequently, the Court declines to accept any testimony by Plaintiff Eugene Taylor as to his membership in Plaintiff NAACP.

### 3.  Declarations

44.  Plaintiffs proffered the declarations of several Georgia voters who lacked Photo ID cards in connection with the 2005 and 2006 preliminary injunction hearings. The State Defendants objected to the Court's consideration of those declarations at trial, arguing that the declarations were hearsay. The Court agrees that the declarations, in general, are hearsay, and have not been

50

rendered admissible by the parties.[3]

At trial, Plaintiffs proffered the declarations of Eleanor Whittenburg and Ruth White, who had passed away since proffering their declarations, arguing that those declarations met the requirements of Federal Rule of Evidence 803(b)(1) or Federal Rule of Evidence 807.   The Court finds that the declarations of Ms. Whittenburg and Ms. White do not satisfy Rule 803(b)(1), as Defendants did not have an opportunity to develop the testimony contained in those declarations via cross-examination.  The Court further finds that those declarations do not meet the requirements of the residual exception of Rule 807, which should be used only in exceptional circumstances.  The Court therefore does not consider the declarations of Ms. Whittenburg and Ms. White in connection with this Order.

---

[3]Similarly, the declarations and affidavits of election officials submitted by the State Defendants in connection with the previous Motions for Preliminary Injunctions are hearsay, and the Court consequently has not considered those materials in connection with this Order.

51

### 4.   Other Deponents

#### a.   Annie L. Johnson

45.   After the trial of the case, Plaintiffs submitted the deposition of Annie L. Johnson, who previously executed two declarations on behalf of Plaintiffs.  (Docket Entry No. 225.)  Ms. Johnson is seventy-seven years old and lives in Plains, Georgia. (Dep. of Annie L. Johnson at 5.)  Ms. Johnson quit school in the sixth grade.  (Id.)  Ms. Johnson testified that she can read and write a little, or "[e]nough to get by."  (Id. at 25.)

46.   Ms. Johnson has anemia and must take protein shots each week or month.  (A. Johnson Dep. at 6, 22.)  Ms. Johnson also suffers from pain in her legs.  (Id. at 6-7.)

47.   Ms. Johnson's daughter lives in Terrell County.  (A. Johnson Dep. at 21.)  Ms. Johnson has a son who lives in Plains, whom she sees nearly every day.  (Id. at 21-22.)  Ms. Johnson's other son lives in Albany, Georgia.  (Id. at 21.)

48.  Ms. Johnson does not drive. (A. Johnson Dep. at 7.)  Ms.

AO 72A

(Rev.8/82)

Johnson's son and daughter drive her places, including driving her to her doctor's appointments. (Id. at 7, 21-22, 42.) According to Ms. Johnson, her son in Plains provides transportation to her wherever she needs to go. (Id. at 21-22.) That son does not have a vehicle, but will arrange to provide one if necessary. (Id. at 21-22, 42.)

49. Friends also drive Ms. Johnson. (A. Johnson Dep. at 7, 23, 42.) Ms. Johnson testified that sometimes she has to pay someone $5.00 or $10.00 to drive her places. (Id. at 43-44.) Ms. Johnson's son and daughter do not charge her for transportation. (Id. at 44.)

50. As far as Ms. Johnson is aware, Plains does not have a public transportation service. (Id. at 7, 22.) If Ms. Johnson needs to go somewhere, her friends or her family will take her. (Id. at 23.)

51. Ms. Johnson has never had a driver's license, or passport, or any other government identification other than a Social Security card. (A. Johnson Dep. at 8.) Ms. Johnson lost her social security card, and does not have a birth certificate. (Id.) Ms.

53

Johnson does not have a government-issued Photo ID, and is not a government employee.  (Id. at 9.)

52.  According to Ms. Johnson, she is registered to vote.  (A. Johnson Dep. at 9.)  Ms. Johnson recalls voting for President Carter and in city elections.  (Id. at 9-10, 17, 39.)  Ms. Johnson testified that she last voted approximately two years ago, and that she voted in Americus, Georgia, on that occasion.  (Id. at 10-11, 20.) Ms. Johnson testified that she believed she voted in Americus because there was a problem with the voting machines in Plains.  (Id. at 11, 17.)  A member of the city council transported Ms. Johnson and other people from Plains to Americus to vote via a van.  (Id. at 11-12, 20.)

53. Ms. Johnson ordinarily would vote in Plains, and someone would transport her to the polls.  (A. Johnson Dep. at 12, 21.) When Ms. Johnson votes in Plains, people generally know her.  (Id. at 13.)

54.  According to Ms. Johnson, her county registrar's office is

AO 72A

(Rev.8/82)

located in the courthouse in Americus.  (A. Johnson Dep. at 13.)

Ms. Johnson also testified that the closest driver's license was

somewhere in Americus.  (Id. at 13.)  Ms. Johnson goes to

Americus at least once a month.  (Id. at 13, 44.)

55. Ms. Johnson's husband voted absentee on one occasion.

(A. Johnson Dep. at 14.)  Ms. Johnson apparently assisted her

husband in voting his absentee ballot.  (Id. at 14, 18-19.)

56. Ms. Johnson prefers to vote in person.  (A. Johnson Dep.

at 14, 34.)  When asked why she prefers to vote in person, Ms.

Johnson testified:

> Well, I guess because one thing if the papers, you send
> them in the mail, they may get lost or I don't understand
> all the questions on it and I can't fill it out like I should.
> And if I come to vote I maybe don't have to do the
> writing.  That's all.  Nothing I got against it, just more
> convenience for me if I can get here to vote in person.
> It saves a lot of papers.

(Id. at 14.)  Ms. Johnson testified that she does not wait until the

day of the election to decide which candidate will receive her vote.

55

(Id. at 15.) Ms. Johnson did not know that she could vote absentee by mail without presenting a Photo ID. (Id. at 35.)

57. Ms. Johnson does not have a computer, and does not use the Internet. (A. Johnson Dep. at 15.)

58. Ms. Johnson initially testified that she did not recall giving two declarations in this case. (A. Johnson Dep. at 25, 27.) Ms. Johnson later testified that "President Carter's deacon" came to her house with the statements, and she signed the statements. (Id. at 27-29, 37-38, 40, 45.) Ms. Johnson's testimony indicates that she did not fully understand what she was signing. (Id. at 38, 45-46.)[4]

59. Ms. Johnson does not believe that she should have to show a Photo ID to vote, because she has been voting without one for many years. (A. Johnson Dep. at 15, 26.) Ms. Johnson did not

---

[4]Ms. Johnson apparently thought that she had done something wrong or was in trouble for signing the statements. (A. Johnson Dep. at 33 ("So here I did wrong for signing this paper here?  Is that what you're talking about?"), 34 ("I signed these papers wrong, is that what you mean?"), 38 (And if I know it was wrong I never would have signed them."), 45 (expressing concern as to whether Ms. Johnson had done something wrong by signing the statements), 46 ("So I hope I didn't do wrong because I never been in trouble in my life.").

56

know that she could go to her registrar's office and get a free Voter ID card. (Id. at 31-32.)

60. Ms. Johnson testified that she knew she would be able to get a Voter ID card, and that she planned to go to Americus during either the week of her deposition or the following week. (A. Johnson Dep. at 31.) Ms. Johnson testified that she would not mind getting a Voter ID card if she did not have to have a birth certificate to obtain one and if the Voter ID card were free. (Id. at 32, 41.)

61. Ms. Johnson further stated that she dd not think that it would be hard to get a Voter ID card. (A. Johnson Dep. at 33.) According to Ms. Johnson:

> If I can get the photo ID, I don't mind getting it. She told me I can get it and don't have to pay for it. I didn't know all the details of getting one and I do now. That's why I haven't gotten one. But since she says it's free, I will get one, pick up one as soon as I get over there.

(Id. at 41.)

AO 72A

(Rev.8/82)

### b.   Larry Dewberry

62.  Plaintiffs also filed the deposition of Larry Dewberry after the trial of this case concluded.  (Docket Entry No. 224.)  Mr. Dewberry lives in Fort Valley, Georgia, and is fifty-four years old. (Dep. of Larry Dewberry at 5.) Mr. Dewberry completed high school and attended, but did not complete, college.  (Id. at 5-6, 13.)

63.  Mr. Dewberry previously had a driver's license, but does not currently have one.  (L. Dewberry Dep. at 7, 15-16.)  Mr. Dewberry can drive, but does not drive.  (Id. at 7.)

64.  Mr. Dewberry has an expired military ID and an expired college ID.  (L. Dewberry Dep. at 7, 18-19.)

65.  Mr. Dewberry either walks places or has his brother or sister drive him places.  (L. Dewberry Dep. at 8.)  Mr. Dewberry's brother and sister previously have taken time off from work to drive Mr. Dewberry places.  (Id. at 8.)  Additionally, Mr. Dewberry's children give him rides.  (Id. at 17.)

66.  According to Mr. Dewberry, Fort Valley has vans that will

transport people. (L. Dewberry Dep. at 10.) Mr. Dewberry believes the fee for the van ride is $2.00. (Id.)

67.    Mr. Dewberry is registered to vote, and thinks he registered in the 1970s. (L. Dewberry Dep. at 8, 12, 20.) Mr. Dewberry also recalls registering to vote on May 4, 2006, at his local registrar's office. (Id. at 20-21, 28.) Some people from Atlanta took Mr. Dewberry to register to vote on that occasion. (Id. at 21-22.)

68.    Mr. Dewberry is not certain when he last voted, but believes he last voted in 2005 or 2006. (L. Dewberry Dep. at 8-9, 22-23.) Ms. Dewberry rode with a lady named "Inez" or in cars provided by candidates to his polling place. (Id. at 9-10.)

69.    The closest DDS service center to Mr. Dewberry's residence is in Perry, Georgia. (L. Dewberry Dep. at 10.) According to Mr. Dewberry, that DDS service center is approximately ten to twelve miles from his residence. (Id. at 10-11.)

59

70.  Mr. Dewberry's local registrar's office is approximately one-quarter of a mile from Mr. Dewberry's residence, and he can walk there in approximately seven to eight minutes (L. Dewberry Dep. at 17.)

71.  Mr. Dewberry has never voted via absentee ballot.  (L. Dewberry Dep. at 11, 34.)  Mr. Dewberry testified that he prefers to vote in person, but stated that he did not know why.  (Id. at 11.)

72.  Mr. Dewberry further testified that he did not really think that people should be required to have Photo ID to vote, although "it could be good to have."  (L. Dewberry Dep. at 12, 39.)

73.  Mr. Dewberry now understands that he does not have to pay for a Voter ID card. (L. Dewberry Dep. at 29.)  According to Mr. Dewberry, no one told him that he could go to his registrar's office and get a Voter ID card for free.  (Id. at 32.)  If Mr. Dewberry had known that information, he would have gotten a Voter ID card.  (Id.)  Mr. Dewberry plans to get a Voter ID card.  (Id.)

74.  Mr. Dewberry thought he needed a birth certificate to get

60

a Voter ID card.  (L. Dewberry Dep. at 35.)

75.  Mr. Dewberry testified that it was not a hardship for him to walk to the registrar's office and get a Voter ID card.   (L. Dewberry Dep. at 36.)

76. Mr. Dewberry signed two declarations for use in this case. (L. Dewberry Dep. at 24 & Exs. 1-2.)  Mr. Dewberry contends that he had registered to vote before he signed the declarations.  (Id. at 27.)

## B.   Organizational Plaintiffs

77.   Edward DuBose, who resides in Columbus, Georgia, serves as the state president for the Georgia State Conference of Plaintiff NAACP.  (Aug. 22, 2007, Trial Tr. at 27, 29.)   In that position, Mr. DuBose's responsibilities include overseeing all operations of Plaintiff NAACP's units in Georgia.  (Id. at 29.)

78.   Plaintiff NAACP's mission is to ensure political, educational, and economic equality for its members, as well as to eliminate racial discrimination and hatred.  (Aug. 22, 2007, Trial Tr.

61

at 29.) Plaintiff NAACP seeks to empower voters to go to the polls and to vote on issues. (Id.) To that end, Plaintiff NAACP is involved in voter registration, mobilization, and education. (Id. at 30.)

79. Plaintiff NAACP sets up voter registration drives across Georgia. (Aug. 22, 2007, Trial Tr. at 30.) At present, Plaintiff NAACP has fifteen to twenty voter registration drives scheduled throughout Georgia. (Id. at 31.)

80. Plaintiff NAACP's voter education efforts include attempting to inform voters concerning issues. (Aug. 22, 2007, Trial Tr. at 31.) To accomplish that goal, Plaintiff NAACP provides a political forum and literature, and grades politicians on issues important to Plaintiff NAACP's constituents. (Id.)

81. As part of Plaintiff NAACP's voter mobilization efforts, Plaintiff NAACP has undertaken initiatives to get voters to the polls that involve working with other organizations. (Aug. 22, 2007, Trial Tr. at 32.) Plaintiff NAACP uses churches and civic organizations

62

to transport individuals to polls, and many of the individuals transported are elderly, disabled, or disadvantaged individuals. (Id.)

82. In 2004, Plaintiff NAACP spent $20,000 to $30,000 on its voter empowerment initiative. (Aug. 22, 2007, Trial Tr. at 32, 39.) Funds for that effort came from both local and national sources. (Id. at 39.) Plaintiff NAACP's national organization will attempt to examine voting laws to determine which states need additional money. (Id. at 39-40.) In the past, Plaintiff NAACP's national organization has attempted to re-direct resources to other states with Photo ID requirements. (Id. at 40.) The reallocation could occur with any change in election law. (Id. at 40.) Alternatively, Plaintiff NAACP could encourage its members to vote by mail. (Id. at 49.)

83. Plaintiff NAACP generally uses volunteers to staff its voter empowerment initiatives, but it must use funds to purchase literature and set up forums. (Aug. 22, 2007, Trial Tr. at 32.)

63

AO 72A

(Rev.8/82)

84.  Plaintiff NAACP is aware of the Photo ID requirement. (Aug. 22, 2007, Trial Tr. at 33.)  Plaintiff NAACP generally uses its voter empowerment resources to maximize voter mobility and education.  (Id.)  If the Court sustains the Photo ID requirement, Plaintiff NAACP might have to redistribute its resources for voter education to help registered voters learn of the Photo ID requirements and to get voters in rural areas to obtain Photo ID cards.  (Id.)

85. According to Mr. DuBose, some of the chapter presidents of the Georgia State Conference of Branches of Plaintiff NAACP informed him that at least five individuals would require assistance in obtaining a Photo ID card.  (Aug. 22, 2007, Trial Tr. at 34.)  Mr. DuBose, however, did not identify those individuals or specifically indicate whether those individuals actually were NAACP members.  (Id.)

86. Mr. DuBose testified that the Photo ID requirement is an important issue for Plaintiff NAACP because the Photo ID

64

AO 72A
(Rev.8/82)

requirement potentially affects Plaintiff NAACP's members, and because the Photo ID requirement potentially will affect the population that Plaintiff NAACP serves. (Aug. 22, 2007, Trial Tr. at 34.)

87. Mr. DuBose testified that Plaintiff NAACP educates voters who are physically unable to travel to the polls, and makes an effort to engage those voters in absentee voting. (Aug. 22, 2007, Trial Tr. at 37)   Absentee voting in Georgia has become easier, as it now is "no-excuse" absentee voting. (Id.) Mr. DuBose, however, stated that many African-American voters, particularly elderly voters, are afraid of voting by mail, as they are concerned that their vote will not be counted.  (Id. at 44-45.)  According to Mr. DuBose, those voters have more reassurance that their votes will be counted if they vote in person.  (Id.) Mr. DuBose further testified that some individuals are illiterate and will have problems using an absentee ballot; however, he also acknowledged that those individuals can get a family member to request an absentee ballot and to assist

65

them in completing the ballot.  (Id. at 46-47.)   Although some individuals who need assistance in voting may be embarrassed to ask for assistance at the polls, voting by mail eliminates that particular embarrassment.  (Id. at 47-48.)

### C.   Voting Procedures, Changes in the Voting Laws, and Efforts to Inform Voters of Changes

#### 1.   Changes in Voting Laws and Concerns of Fraud

88.  Prior to January 8, 2007, Cathy Cox served as Georgia's Secretary of State.  (Oct. 12, 2005, Hr'g Tr. at 12.)  During that same period, former Secretary of State Cox also served as the Chair of the State Election Board.  (Id. at 13.)  During the relevant period, the State Election Board consisted of five members, including former Secretary of State Cox, a representative from the Georgia Democratic Party, a representative from the Georgia Republican Party, a representative from the Georgia Senate, and a representative from the Georgia House of Representatives.  (Id. at 13-14.)  During her tenure, former Secretary of State Cox served as the principal official in the State Government in charge of

66

elections and for purposes of the Help America Vote Act of 2002 ("HAVA") and the National Voter Registration Act. (Id. at 14.)

89. During the ten years in which former Secretary of State Cox was affiliated with the Secretary of State's Office, that office received no reports of voter impersonation involving a scenario in which a voter appeared at the polls and voted as another person, and the actual person later appeared at the polls and attempted to vote as himself. (Oct. 12, 2005, Hr'g Tr. at 15-20; July 12, 2006, Hr'g Tr. at 10-11, 29.)  Former Secretary of State Cox did not dispute that under the previous law, it was possible for the above voter impersonation scenario or another form of in-person voter fraud to occur. (Oct. 12, 2005, Hr'g Tr. at 15-20.)

90. Further, former Secretary of State Cox and her staff were not physically present in all 159 counties and the various municipalities on election days. (Oct. 12, 2005, Hr'g Tr. at 15-20; July 12, 2006, Hr'g Tr. at 30.)  Secretary of State Cox therefore acknowledged that issues related to in-person voter fraud may have

AO 72A
(Rev.8/82)

arisen and yet not been reported to her office. (Oct. 12, 2005, Hr'g Tr. at 15-20; July 12, 2006, Hr'g Tr. at 31.) According to former Secretary of State Cox, local election officials are in the best position to know of such incidents. (Oct. 12, 2005, Hr'g Tr. at 15-20.)

91. According to former Secretary of State Cox, during her tenure, the State Election Board received a number of complaints of irregularities with respect to absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 15; July 12, 2006, Hr'g Tr. at 11.) In fact, former Secretary of State Cox recalled that the State Election Board discussed complaints of fraud and irregularities in absentee voting at most of the hearings she attended. (Oct. 12, 2005, Hr'g Tr. at 15.) A number of those complaints involved irregularities in collecting and returning absentee ballots, in which someone who was not authorized to collect or mail the absentee ballots did so for another voter. (Oct. 12, 2005, Hr'g Tr. at 15; July 12, 2006, Hr'g Tr. at 46.)

AO 72A

(Rev.8/82)

92.   Former Secretary of State Cox also was aware of a previous incident in Dodge County, Georgia, involving vote buying and selling of absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 18-19.) The Dodge County incident involved in-person absentee voting. (Id.)

93.   During former Secretary of State Cox's tenure, Georgia had procedures and practices in place to detect voter fraud. (Oct. 12, 2005, Hr'g Tr. at 42.) Those procedures included verifying the voter's correct address, as well as the voter's name, during the check-in process for in-person voters. (Id.) Georgia also imposed criminal penalties for voter impersonation. (Id.) Most violations of Georgia election laws were punishable as felonies. (Id.) According to former Secretary of State Cox, no evidence indicated that the criminal penalties failed to deter in-person voter fraud sufficiently. (Id.)

94.   According to former Secretary of State Cox, the integrity of the voter list also is extremely important in preventing voter fraud.

69

(Oct. 12, 2005, Hr'g Tr. at 59.)  Former Secretary of State Cox's office undertook an investigation in response to an article published in the Atlanta Journal-Constitution concerning fraudulent voting. (Id.)  The investigation revealed that the specific instance of voter fraud outlined in the Atlanta Journal-Constitution, involving a report that Alan J. Mandel had voted after his death, actually did not occur.  (Id. at 59-61.)

95.  During former Secretary of State Cox's tenure, her office attempted to ensure that voter records were maintained and up to date.  (Oct. 12, 2005, Hr'g Tr. at 62-63; July 12, 2006, Hr'g Tr. at 19.) Former Secretary of State Cox testified that, during her tenure, the Secretary of State's Office sent information concerning dead voters to local elections officials on a monthly basis, and had the authority to remove the names of deceased voters from the voter rolls if the local elections officials failed to do so in a timely manner. (Oct. 12, 2005, Hr'g Tr. at 62-63; July 12, 2006, Hr'g Tr. at 19)  To former Secretary of State Cox's best knowledge, the procedures for

70

removing dead voters were consistently followed during her tenure; however, former Secretary of State Cox could not vouch for what every individual county did. (July 12, 2006, Hr'g Tr. at 19.) Former Secretary of State Cox's office was authorized to remove only deceased voters from the voter registration list, and could not remove voters who are otherwise ineligible to vote. (Id. at 19-20.) Former Secretary of State Cox's office also relied on the counties to add voters who had newly registered to vote, and had no authority to add newly registered voters. (Id.)

96. Former Secretary of State Cox expressed concerns with respect to H.B. 244, noting that allowing individuals to vote absentee ballots without showing identification and removing the conditions previously required for obtaining absentee ballots opened a gaping opportunity for fraud. (October 12, 2005, Hr'g Tr. at 15-17.) Former Secretary of State Cox indicated that concerns with respect to absentee ballots involved incidents of individuals picking up absentee ballots for other individuals without the

71

required family relationship and individuals removing absentee ballots from voters' mailboxes.   (Id. at 17-19.)   According to Secretary of State Cox, the only restrictions on absentee voting that tended to prevent fraud were the restrictions for obtaining an absentee ballot. (Id.)

97.   Former Secretary of State Cox also informed Governor Perdue that she believed the Photo ID requirement for in-person voting was unnecessary, created a significant obstacle to voting for many voters, was unlikely to receive preclearance from the Justice Department, violated the Georgia Constitution, and unduly burdened the fundamental right to vote. (Oct. 12, 2005, Hr'g Tr. at 21-22.) The opinion that former Secretary of State Cox expressed in her letter to Governor Purdue remained her personal opinion at the time of the preliminary injunction hearings; however, former Secretary of State Cox acknowledged that she was obligated to enforce and carry out the Photo ID requirement in her official capacity until the law is declared invalid.  (Id. at 22.)

72

AO 72A

(Rev.8/82)

98.  Former Secretary of State Cox also requested that Governor Perdue seek the opinion of Georgia's Attorney General before approving HB 244.  (Oct. 12, 2005, Hr'g Tr. at 23.)  Former Secretary of State Cox was not aware that Governor Perdue sought an opinion from Georgia's Attorney General concerning HB 244, and was not aware of any opinion issued by Georgia's Attorney General concerning the Photo ID requirement.  (Id. at 23-24.)

99.  Former Secretary of State Cox was aware of efforts to submit fraudulent voter registrations.  (Oct. 12, 2005, Hr'g Tr. at 25.)  Those efforts occurred both before and after Georgia enacted its Photo ID requirement.  (Id.)

100.  According to former Secretary of State Cox, at the time of the preliminary injunction hearings, Georgia had no requirement that a person seeking to register to vote present a Photo ID.  (Oct. 12, 2005, Hr'g Tr. at 25-26.)  Indeed, HB 244 did not address voter registration.  (Id.)

101.  Former Secretary of State Cox testified that HB 244

AO 72A

(Rev.8/82)

expanded the opportunity for voters to obtain absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 31; July 21, 2006, Hr'g Tr. at 43-44.) Prior to July 1, 2005, voters seeking to obtain absentee ballots had to aver that they met certain requirements. (Oct. 12, 2005, Hr'g Tr. at 31.) After July 1, 2005, those requirements no longer applied for purposes of obtaining absentee ballots. (Id.)

102. Former Secretary of State Cox opined that a number of Georgia voters are elderly, have no driver's licenses, and have no need for a state-issued Photo ID card other than for voting purposes. (Oct. 12, 2005, Hr'g Tr. at 43.) Further, according to former Secretary of State Cox, a number of Georgia voters who are elderly or have low incomes do not have automobiles or use mass transit, and would have difficulty obtaining a Photo ID to vote. (Id.)

103. On January 8, 2007, Karen C. Handel took office as Georgia's Secretary of State. (Aug. 22, 2007, Trial Tr. at 76.)

104. Secretary of State Handel had no role in drafting, advocating, or preparing the 2005 Photo ID Act, and has not

74

spoken to individuals involved in those activities.  (Aug. 22, 2007, Trial Tr. at 77.)

105.  Similarly, Secretary of State Handel had no role in drafting, advocating, or preparing the 2006 Photo ID Act, and has not spoken to individuals involved in those activities.  (Aug. 22, 2007, Trial Tr. at 77.)

106.  Secretary of State Handel has no knowledge indicating that her office has received a complaint of in-person voter fraud during her tenure.  (Aug. 22, 2007, Trial Tr. at 78.)

107.  Secretary of State Handel pointed out that any such reports would not come to her personal attention, but rather would come to the attention of the Inspector General, who would investigate the complaint.  (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31-32.)  After investigating the complaint, the Inspector General would bring the matter before the State Election Board.  (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31-32.)  Secretary of State Handel does not learn the details of a

75

complaint until the complaint actually comes before the State Elections Board. (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31-32.)

108. Secretary of State Handel testified that her office does not physically update the voter registration rolls to reflect address changes and deaths. (Aug. 22, 2007, Trial Tr. at 79-81.)

109. Instead, Secretary of State Handel's office forwards any information that it receives concerning address changes and deaths to the counties, which in turn bear responsibility for making the changes. (Aug. 22, 2007, Trial Tr. at 79-81.)

110. Secretary of State Handel's office receives a report from the Department of Vital Statistics listing deaths that have occurred. (Aug. 22, 2007, Trial Tr. at 80-81.) Secretary of State Handel does not know how frequently her office receives that report. (Id. at 81.)

111. According to Secretary of State Handel, her office needs to be more systematic with respect to keeping the voter list updated. (Aug. 22, 2007, Trial Tr. at 81.)

76

112.    Secretary of State Handel's office is working with another State association to attempt to develop technology that will enable Secretary of State Handel's office to manage the voter registration list and associated data better. (Aug. 22, 2007, Trial Tr. at 82.)

113.  Secretary of State Handel did not know the date that the voter rolls last were purged to remove voters who had died.  (Aug. 22, 2007, Trial Tr. at 81-83.)

### 2.    In-Person Voting

114.  Presently, elections officials do not compare signatures on voter certificates of in-person voters to signatures on voter registration cards.  (Oct. 12, 2005, Hr'g Tr. at 34.)

115. The voter registration cards are not physically present at the polling places.  (Oct. 12, 2005, Hr'g Tr. at 34.)

116.  Former Secretary of State Cox testified that it would be possible to send voter registration cards to polling places, but that comparing signatures on voter certificates to signatures on voter

AO 72A

(Rev.8/82)

registration cards for in-person voters would be time-consuming. (Oct. 12, 2005, Hr'g Tr. at 35.)

117.  Similarly, current Secretary of State Handel observed that comparing voter signatures for in-person voters on election day would be a "very onerous process."  (Aug. 22, 2007, Trial Tr. at 127.)

118. Although former Secretary of State Cox testified that her office discussed digitizing the signatures on voter education cards, her office did not pursue that option.  (July 12, 2006, Hr'g Tr. at 57.)

119. Local elections officials for counties are connected to the Secretary of State's Office through a mainframe computer.  (Oct. 12, 2005, Hr'g Tr. at 64, 72.)  The Secretary of State's Office does not have that capacity for municipal elections officials; however, in many cases, county elections officials also manage elections for municipalities within their counties.  (Id.)

120.  An individual who votes in person but does not present a Photo ID may vote a provisional ballot.  (Oct. 12, 2005, Hr'g Tr.

78

AO 72A

(Rev.8/82)